Chandler G. KETCHUM and Harold S. Bigler, Plaintiffs,

v.

Edward J. GREEN et al., Defendants.

Civ. A. No. 76-571.

United States District Court,
W. D. Pennsylvania.

July 14, 1976.

Edmund K. Trent, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for plaintiffs.

John J. McLean, Jr., Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for defendants.

## OPINION

TEITELBAUM, District Judge.

This is an action for injunctive relief arising out of an internal struggle for control of Babb, Inc., a Pennsylvania corporation engaged primarily in the insurance brokerage business in Pittsburgh, Cleveland and Philadelphia.

Such a contest is rarely an amiable affair —indeed, especially in the arena of the small, private corporation, a struggle for power is often intense and bitter, generated by a basic clash of strong personalities and conflicting business policy judgments. For the loser, the consequences can be both swift and severe, and it is therefore not surprising that the courts are frequently called upon to determine the legality of the mode of intra-corporate combat and the legitimacy of its outcome. But it is obviously not every corporate conflict that sparks a cognizable legal claim. Especially in the federal forum, where the prevailing principle of limited jurisdiction protects no less than the right and power of the state to adjudicate controversies governed by its laws, the Court must not permit empathy for the plight of the vanquished to impel an overreaching of subject matter jurisdiction in circumstances that do not clearly reveal a basis for a federal cause of action.

So it is with the difficult case *sub judice,* an action in equity founded for federal jurisdictional purposes upon an alleged violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5, promulgated thereunder. Plaintiffs Ketchum and Bigler are, respectively, the recently-ousted chairman of the board and the recently-ousted president of Babb, Inc. (Babb). Their combined service with Babb and its organizational predecessors totals some 55 years, and, since 1967, they (along with certain of the defendants herein) have actively managed the corporation. During the period of their stewardship, Babb has grown from 30 to 140 employees, and its annual revenues have increased from $600,-000 to more than $4,000,000.

Nonetheless, in late 1975, several of the individual defendants in this case, all seven of whom were and are directors of the corporation, began discussing among themselves the possibility of either severing their associations with Babb or, alternatively, removing plaintiffs from top management positions at the time of the 1976 elections. Babb had not shown a profit for at least three preceding years, and, in view of the defendant-directors, this decline was the direct result of what they deemed to be plaintiffs' "wasteful and counter-productive" diversion of corporate resources into "unrelated, losing venture," and "repeated disregard" of the board of directors in the for-

mulation of important corporate decisions. In early 1976, certain of the defendants, subsequently joined by the others, determined that they would oppose plaintiffs' reelection as officers of the company.

On April 23, 1976, the date of the annual shareholders meeting and the critical juncture in the chain of events here in question, the eleven individuals who had comprised the membership of Babb's board of directors throughout the prior year—the two plaintiffs, seven defendants and two other persons not parties to this lawsuit—again were nominated by a committee of the board to serve as directors for the following year. By unanimous voice vote, the assembled shareholders reelected the same eleven individuals as directors.[1]

Immediately following the shareholders meeting, the newly-reelected board met in accordance with corporate by-laws to elect officers for the upcoming year. The nominating committee proposed the election of a slate of officers including plaintiff Ketchum as chairman and plaintiff Bigler as president. An opposing slate was nominated, including neither plaintiff, but naming defendant Waugh as chairman and defendant Livingston as president. In the ensuing ballot, Ketchum and Bigler were defeated by a vote of 7 to 4 (the seven defendants against the two plaintiffs and the two additional directors). Waugh was elected chairman and Livingston was elected president.

Following the election of officers, a resolution to terminate Babb's employment of plaintiffs Ketchum and Bigler—neither of whom had employment contracts with the company or its subsidiaries—was adopted by a similar 7 to 4 vote. Plaintiffs were discharged immediately, with one week's salary.

Upon termination of their employment, plaintiffs were required by the terms of previously-executed stock retirement agreements to resell their shares of Babb stock to the company.[2] All shares of Babb stock are held by employees pursuant to such stock retirement agreements, and all such agreements provide for the compulsory sale to and repurchase by Babb of all outstanding shares held by a shareholder "on his termination of employment for any reason or on his death." Babb has consistently enforced this stock retirement agreement—the provisions of which apparently were drafted at the instruction, and with the participation, of plaintiffs Ketchum and Bigler—against every employee terminated by the corporation. Accordingly, at the conclusion of the April 23 organization meeting, pursuant to the terms of the repurchase agreements executed by plaintiffs, Babb tendered checks and notes to Ketchum and Bigler in

1. It should be noted at this point that, since its incorporation in 1961, Babb has been held exclusively by company employees. As of April 23, 1976, the company's 470,845 shares of outstanding common stock were held by sixteen shareholder-employees, as follows:

| | |
|---|---|
| Plaintiff Ketchum | (120,000 shares) |
| Plaintiff Bigler | ( 87,000 shares) |
| Defendant Waugh | ( 87,000 shares) |
| Defendant Livingston | ( 60,000 shares) |
| Defendant Steele | ( 60,000 shares) |
| Defendant Green | ( 12,500 shares) |
| Defendant McCutchen | ( 2,000 shares) |
| Defendant Roof | ( 7,500 shares) |
| Higham | ( 14,454 shares) |
| Hainsfurther | ( 6,500 shares) |
| Smith | ( 6,120 shares) |
| Parks | ( 3,850 shares) |
| Williams | ( 2,750 shares) |
| Sneath | ( 777 shares) |
| Corigliano | ( 389 shares) |
| Zimmerman | ( 5 shares) |

At the time of the annual meeting, plaintiffs held 44% of the outstanding stock; six of the seven individual defendants held 48.6%. Pursuant to notice mailed April 5, 1976, shareholders representing some 440,000 shares of common stock were physically present at the shareholders meeting of April 23. Additional proxies representing 6,509 shares (naming plaintiffs as proxy) and 14,454 shares (naming Whitridge as proxy) were filed with the secretary prior to the meeting.

As of April 23, 1976, the following individuals were members of Babb's board of directors: plaintiff Ketchum; plaintiff Bigler; defendant Waugh; defendant Livingston; defendant Steele; defendant Green; defendant McCutchen; defendant Roof; defendant Hiltz; Whitridge; Hainsfurther.

2. Subsequent to Babb's incorporation, shares of its stock were made subject to a stock retire-

the contractually-obligated aggregate amount of $544,410, or $2.63 per share for 207,000 shares of company stock.[3]

Plaintiffs returned the checks and notes to defendants and subsequently filed the instant action, alleging, *inter alia,* federal securities fraud. They request, *inter alia,* that the Court enjoin defendants Waugh and Livingston from occupying the offices to which they were elected on April 23, return plaintiffs to their former positions and restrain defendants (a majority of the board of directors) "from taking any other action to change or disturb the arrangements for the management and operation of defendant Babb, Inc. . . ."

We emphasize at the outset that what has been set forth above is no more than a factual skeleton constructed for dispositional purposes, and does not purport to be a complete summary of the facts which give rise to the instant litigation. The circumstances surrounding the termination of plaintiffs' employment are both intricate and complex, and, in another forum, might well merit closer scrutiny. But such scrutiny is not automatically warranted here, where entitlement to any remedy is, initially, entirely dependent upon the Court's acceptance of the proposition that plaintiffs have alleged a cause of action under the federal securities law embodied in Rule 10b–5. If that proposition is rejected, our inquiry is properly at an end, for, regardless of the legality *vel non* of defendants' conduct in ousting and discharging plaintiffs under state corporation law, this Court would lack jurisdiction to determine plaintiffs' pendent state claims. After a full hearing in this matter, and careful consideration of the various briefs and memoranda of the parties, I am persuaded that plaintiffs have failed to state a cognizable federal claim, and that the Court is therefore deprived of subject matter jurisdiction in this case.

The essence of Rule 10b–5 is its proscription of "fraud in connection with the purchase or sale of any security."[4] Plaintiffs endeavor to bring their action within the bounds of the Rule's proscription via the allegation that, prior to April 23, 1976, defendants failed to disclose and tacitly misrepresented to fellow shareholders their intention to vote against the reelection of plaintiffs as officers and to terminate their employment with Babb at the organization meeting following defendants' own reelection to the board by the shareholders. Plaintiffs contend that this "active nondisclosure" amounted to fraud which directly infected the shareholder vote for directors,

---

ment or repurchase agreement. This was replaced by a similar agreement of November 18, 1968, which in turn was amended in 1969, 1971 and 1974.

3. Under ¶ 5 of the stock retirement agreement, a shareholder whose employment is terminated for any reason other than death or normal retirement must sell all his stock, and the corporation must purchase it, at either $2.63 per share or the price the employee paid for the stock, whichever is greater. Plaintiffs each paid $.10 per share for their stock in Babb. As of December 21, 1975, the book value of such stock was approximately $1.46 per share.

4. The Securities Exchange Act of 1934, as amended, provides in Section 10 (15 U.S.C. Sec. 78j) that:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails . . .

"(b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."

Rule 10b–5 (17 C.F.R. Sec. 240.10b–5) defines the practices forbidden as follows:

"It shall be unlawful . . . .

(a) To employ any device, scheme, or artiface to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

which in turn tainted the subsequent board votes to depose and discharge plaintiffs, which in turn triggered the operation of the stock retirement agreements compelling the sale and corporate repurchase of plaintiffs' Babb stock. Ergo, plaintiffs submit, a claim for fraud "in connection with the purchase or sale" of a security has been stated in this case.

The Court does not agree. It is not necessary to engage in lengthy discourse on each of the requisite elements of a cause of action under Rule 10b–5,[5] or to address each of the parties' multiple and rather sophisticated arguments regarding the existence *vel non* of such elements in these circumstances. It is sufficient to note that the "in connection with" language of Rule 10b–5 requires a showing of causation between the alleged fraud and a plaintiff's sale (or purchase) of a security, see *Affiliated Ute Citizens v. U. S.,* 406 U.S. 128, 154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), and to express the Court's basic view that the instant plaintiffs cannot be deemed to have satisfied this causation requirement where the sale of their Babb stock occurred solely as a matter of contractual obligation, by operation of long-standing stockholders retirement agreements between plaintiffs and the company, and not as the result of the allegedly tainted stockholders' vote for directors. Indeed, it is difficult to discern any merit in the contention that defendants' assertedly fraudulent conduct caused the instant securities transaction when it is clear that it was plaintiffs' termination, and

not their ouster as officers, that triggered the forced sale and repurchase of their stock. Inasmuch as defendants constituted a majority of Babb's board of directors prior to the 1976 shareholders meeting and therefore could have caused Babb to terminate plaintiffs at any time prior thereto, the sale of plaintiffs' stock was not caused by any fraud that might have affected the results of the annual meeting. Accordingly, the Court would be compelled to find an absence of causation in this case even if it were to accept the rather dubious propositions that the alleged non-disclosures amounted to actionable fraud[6] and that such fraud caused plaintiffs' ouster as officers of the company.

The above result necessarily follows from an orthodox causation analysis. The causation element of Rule 10b–5 may be evaluated through the application of materiality and reliance tests. See *Harnett v. Ryan Homes, Inc.,* 496 F.2d 832 (3d Cir. 1974). The former is measured by the standard of "whether 'a reasonable man would attach importance [to the undisclosed or misrepresented facts] in determining his choice of action in the transaction in question.'" *Rochez Bros. v. Rhoades, supra* at 408 (citations omitted). The latter is judged by whether the plaintiff would have acted differently had he known the undisclosed or misrepresented information. *Id.* at 410–411. Obviously, neither objective materiality nor subjective reliance is present here. Plaintiffs were contractually bound to sell their shares to Babb upon

---

5. In this regard, see *Thomas v. Duralite Co.,* 524 F.2d 577 (3d Cir. 1975); *Fenstermacher v. Philadelphia National Bank,* 493 F.2d 333 (3d Cir. 1974); *Rochez Bros. v. Rhoades,* 491 F.2d 402 (3d Cir. 1974).

6. For purposes of the above discussion, the Court assumes the existence of actionable fraud. That assumption, however, is made *arguendo* only—indeed, the Court would have serious problems with a finding of actionable fraud on these facts. Given my view on the causation issue, these problems need not be fully developed here. However, the Court's doubts regarding actionable fraud in this instance are deep enough to have had some sup-

portive impact on its decision, and it is therefore necessary to note, without holding, that defendants appear to have acted in this matter entirely within the confines of Pennsylvania corporation law as well as Babb's by-laws and articles of incorporation. It is far from clear that, prior to April 23, 1976, defendants were under any legal duty to disclose their intentions to oust and terminate plaintiffs. See *e. g. Phillips v. Reynolds & Co.,* 294 F.Supp. 1249, 1255 (E.D.Pa.1969) (holding that a nondisclosure is not *per se* actionable fraud under Rule 10b–5 unless the defendant was under a duty to make a disclosure concerning the subject).

termination of their employment. They had no choice in this matter at the time of the operative events in this case. Clearly, the alleged fraud could not have influenced a reasonable man's decision to sell his stock to Babb after termination when that man had previously committed himself to such a sale; nor could plaintiffs themselves have relied on allegedly fraudulent acts occurring long after plaintiffs had contracted to make the sale in question. Thus, as a matter of traditional analysis, as well as pursuant to a conviction that the relationship between the nondisclosures and the forced sale of plaintiffs' shares is simply too attenuated to present a viable Rule 10b–5 claim, the Court must conclude that the requisite causation is absent in this case.

■ It is important to recognize in this regard that there has been no allegation of fraud or deceit surrounding plaintiffs' signing of the original stockholders retirement agreements in 1962 or the various amendments thereto since that time. Moreover, the agreements in question clearly appear to be facially valid, and, as a species of contract, are in no way inherently suspect: similar provisions have been upheld by the courts, see, e. g., *Clayton v. Clow & Sons,* 327 F.2d 382 (7th Cir. 1964), and would appear to be authorized by statute in this Commonwealth (15 Pa.Stat.Annot. § 1613.-1C). In sum, the record is utterly devoid of anything to indicate that the stock retirement agreements between plaintiffs and Babb are themselves tainted by fraud or invalid in any respect.[7]

In these circumstances, only the most boundlessly expansive reading of Rule 10b–5 would permit the Court to discern the existence of a cause of action for feder-

---

7. The Court has not failed to consider plaintiffs' assertion that under the terms of the instant agreements, they will receive an inadequate consideration for their shares of Babb stock, and that the forced sale of such stock "at a fraction of its fair market value" operates to enhance the value of defendants' shares. This, plaintiffs submit, raises a compelling inference that they are being "squeezed out" of ownership in the corporation for defendants' personal pecuniary benefit. Citing two Second Circuit decisions (*Green v. Santa Fe Industries, Inc.,* 533 F.2d 1283, 2 Cir., CCH Fed.Sec.L.Rep. ¶ 95,447 (1976) and *Marshel v. AFW Fabric Corp.,* 533 F.2d 1277, 2 Cir., CCH Fed.Sec.L. Rep. ¶ 95,448 (1976)), plaintiffs contend that such a squeeze-out of a minority by and for the personal benefit of those in control of a corporation constitutes actionable fraud under Rule 10b–5.

We note initially that the cases cited by plaintiffs are clearly distinguishable from the suit *sub judice.* See *Marsh v. Armada Corp.,* 533 F.2d 978, CCH Fed.Sec.L.Rep. ¶ 95,496 at 99,-525 (6th Cir. 1976) (stating that *Green* and *Marshel* "cannot be read apart from the milieu of 'going private' merger transactions"). Moreover, even if applicable herein, these decisions apparently require a showing that (1) defendants have acted without any justifiable business purpose and (2) that plaintiffs are receiving a wholly inadequate consideration for their shares of stock. *Nash v. Farmers New York Life,* CCH Fed.Sec.L.Rep. ¶ 95,519 at 99,-661 (S.D.Ohio 1976). The Court intimates no view with regard to the existence *vel non* of a justifiable business purpose for defendants' ac-

tions in this matter. As to the second requirement, however, it is in these circumstances quite simply impossible to conclude that the consideration to be paid for plaintiffs' shares is wholly inadequate. Per their contracts with Babb, plaintiffs are receiving $2.63 per share for stock which they purchased at $.10 per share, or $540,000 for stock purchased for $20,-700 in 1962. The evidence adduced at trial—including testimony that the book value of Babb's stock was $1.44 per share as of the first quarter of 1976, that plaintiffs previously made offers to defendant Livingston at $2.63 per share and that there exists a long history of corporate repurchases at the contract price—clearly indicates that the $2.63 per share price which Babb was obligated to offer plaintiffs is the fair value of their stock. Moreover, plaintiffs' $15 per share estimate is a valuation based on gross revenues, rather than on book values, earnings or agreed price. See Garrity, *Buy-Sell Agreements,* 46 Pa.B.Q. 190, 193 (March 1975). Plaintiffs plainly agreed (in ¶ 5) to the method of valuation in their stock retirement agreements. Not only do they appear to have been instrumental in devising such agreements, they also have in the past caused Babb to exercise similar agreements when other employee-shareholders were terminated. In such circumstances, plaintiffs cannot now be permitted to protest the fairness of the stock retirement agreements or the adequacy of the method of valuation which they embraced. See generally, *Brown Estate,* 446 Pa. 401, 289 A.2d 77 (1972); *Mather Estate,* 410 Pa. 361, 189 A.2d 586 (1963).

al securities fraud. In this vein, I am mindful of the Supreme Court's admonition that Rule 10b–5 must be read "flexibly." *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). But the very word implies contraction and expansion in light of the circumstances, and clearly does not impart an unlimited scope to the Rule. *Id.* at 12, 92 S.Ct. 165. Moreover, in evaluating plaintiffs' apparent contention that 10b–5 reaches every securities transaction remotely related in any way to activities alleged to be fraudulent, it is important to consider that the broad exercise of federal jurisdiction, though sometimes clearly necessary or appropriate, amounts to nothing less than the broad assertion of federal power and, as such, never reverberates in a vacuum or impacts merely on an isolated lawsuit. Rather, each such exercise of jurisdiction works a diminution—both in an immediate, specific sense and as a matter of precedent—of the state's power to determine controversies arising under its laws, and, in my view, such undertakings should therefore be confined to cases that pose questions of true federal significance. I do not believe that this is such a case.

In *Blackett v. Clinton E. Frank, Inc.,* 379 F.Supp. 941 (N.D.Ill.1974), the court dismissed a Rule 10b–5 claim on facts strikingly similar to those which obtain herein, stating as follows:

> "This is an example of a trend of cases in which the invocation of federal securities laws is wholly inappropriate and wide of the Congressional mark. . . . The vice of the instant complaint is that the plaintiff has engrafted upon a state cause of action a misplaced federal securities law claim which, but for that inappropriate federal gloss, would have been litigated in a local state court." *Id.* at 944 (citations omitted).

■ In my view, that language is entirely apposite in the context of the instant case. By any realistic standard of appraisal, plaintiffs' complaint goes to the propriety of their ouster and discharge, and not to the sale or purchase of their Babb stock. They have engrafted a remote wisp of a Rule 10b–5 claim upon a cause of action controlled entirely by state law governing the actions of the board of directors of a Pennsylvania corporation. The "federal gloss" on their lawsuit is simply too thin to invoke the Court's jurisdiction in this matter. Accordingly, the instant action will be dismissed by appropriate Order.