HALLE & STIEGLITZ, FILOR, BULLARD INC., and M. A. Gordon & Company, Inc., both Delaware Corporations, Plaintiffs,

v.

EMPRESS INTERNATIONAL, LTD., a Delaware Corporation, Martin Kolen and Irene Kolen and Maxwell Goldpin, as Trustees under certain trusts for the benefit of the children of Martin Kolen, Defendants.

Civ. A. No. 75–33.

United States District Court, D. Delaware.

Nov. 2, 1977.

Bruce M. Stargatt, Jack B. Jacobs and
Richard A. Levine of Young, Conaway,
Stargatt & Taylor, Wilmington, Del., for
plaintiffs.

Lewis S. Black, A. Gilchrist Sparks and Martin P. Tully of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendants.

LATCHUM, Chief Judge.

Plaintiffs, Halle & Stieglitz, Filor, Bullard Inc. ("Halle & Stieglitz") and M. A. Gordon & Co., Inc. ("Gordon"),[1] by an amended complaint seek to enforce liabilities and duties against the defendants allegedly created by Sections 10(b), 14(a) and 14(e) of the Securities Exchange Act of 1934 ("the Act") [15 U.S.C. §§ 78j, 78n(a), 78n(e)], Rule 10(b)(5), [17 C.F.R. 334, § 240.-10b–5], and by Delaware law.[2] The defendants are: (1) Empress International, Ltd. ("Empress"), a Delaware corporation which has its principal office in Lake Success, New York, and is engaged in the sale and distribution of imported frozen seafood products throughout the United States, (2) Martin Kolen ("Kolen") who is President, Chief Executive Officer, a director and majority stockholder of Empress, and (3) Irene Kolen (who is Kolen's wife) and Maxwell Goldpin (Irene Kolen's brother), who are Trustees of four trusts for the benefit of Kolen's children funded by Empress stock.[3] The defendants have answered, denied the material allegations of the amended complaint and counterclaimed against the plaintiffs alleging violations of Section 10(b) of the Act [15 U.S.C. § 78j], Rules 10b–6 and 10b–7 [17 C.F.R. 334 §§ 240.10b–6 and 10b–7], the Underwriting Agreement of May 3, 1972, and Section 206 of the Investment Advisors Act of 1940 ("the Advisors Act"), [15 U.S.C. § 80b–6].

The case is before the Court (1) on defendants' motion for summary judgment dismissing the amended complaint[4] and (2) plaintiffs' motion for summary judgment dismissing defendants' counterclaims.[5]

*Background Facts*

Empress was organized in 1968 and until May, 1972, all 620,000 shares of its outstanding common stock were owned by defendant Kolen and the four trusts for his children.[6] In May, 1972, Empress changed from a private to a publicly held company by virtue of a public offering and sale of 320,000 shares of its common stock.[7] Of the 320,000 shares, all of which were sold to underwriters headed by Halle & Stieglitz on a firm commitment basis, 160,000 were sold by Empress and 160,000 by Kolen and the four trusts.[8] Plaintiff Halle & Stieglitz, as managing underwriters, set the public offering price of $14.50 per share.[9]

Empress' common stock traded over-the-counter from May, 1972, until it was listed on the American Stock Exchange in October, 1972, and during this period the stock rapidly declined to a low of 4½; in 1973 prices ranged from a high of 7⅝ to a low of 1⅝ and between January 1 and September 20, 1974, prices varied between 1⅝ and 3⅜.[10]

Kolen testified on oral deposition that in May or June, 1974, he decided, in view of the general recession, stock market conditions, and the possibility of reducing costs associated with being a public company, that Empress should consider going private and that he discussed this matter informally in August with a number of Empress'

---

1. Plaintiffs also purport to bring this action on behalf of all shareholders of Empress, other than defendants, who were shareholders on September 23, 1974, and who thereafter tendered their shares or sold their Empress shares on the arbitrage market as a result of the tender offer.

2. Docket Item 27.

3. *Id.* pars. 2, 4 & 5.

4. Docket Item 29.

5. Docket Item 60.

6. Docket Item 27, pars. 5 & 6; of the 620,000 common shares outstanding in May, 1972, Kolen owned 496,000 shares and the four trusts owned a total of 124,000 shares, each trust owning 31,000 shares.

7. *Id.* par. 7.

8. *Id.* par. 7; Docket Item 61, Ex. A.

9. Docket Item 57, p. 28.

10. Docket Item 27, Ex. A, pp. 4 & 5.

directors who agreed in principle to the concept of such a step.[11] Kolen also in late August consulted with Leslie Jacobson, a director and member of the law firm representing Empress, regarding the possibility of an exchange offer by Empress in which Empress would exchange debentures for its publicly-held common stock.[12] The first meeting of Empress representatives with the company's attorneys took place on September 4, 1974, at which time the attorneys began their legal research and drafting of documents for the debenture exchange offer and they proceeded in that effort until September 19, 1974.[13] During the course of this legal work, the attorneys concluded that any disclosure of the proposed exchange offer of debentures prior to the time that a trustee for the proposed debentures was qualified pursuant to the Trust Indenture Act of 1939 would violate that Act. Since no such qualification took place, no public disclosure was ever made of the contemplated exchange offer of debentures.[14]

During this legal research and discussion period the proposal to offer public shareholders a $6 or $7 debenture at 6 or 7 percent interest was abandoned because it was believed (1) that the debentures would sell at a substantial discount (the prime interest rate then being 11 percent), (2) that the issuance of debentures would not relieve Empress of the obligation to make public filings under the federal securities laws, and (3) that problems would be encountered in qualifying a trustee for the debentures.[15] Instead, on September 19, 1974, Kolen concluded, subject to bank approval for a loan and approval of Empress'

directors, that in lieu of an exchange offer of debentures Empress should make a cash tender offer of $4.50 per share, a price arrived at informally through discussions with board members.[16] Over the next three days, Kolen secured bank approval of a loan and verbal approval of the directors of Empress for the cash tender offer.[17] The decision of the Empress directors approving the tender offer was confirmed on October 1, 1974, by a unanimous written consent executed under the authority of 8 Del.C. § 141.[18] An Offer to Purchase, dated September 24, 1974, at $4.50 per share, was mailed to all Empress stockholders; the offer was to expire on October 24, 1974.[19]

Immediately before the tender offer, Empress had a total of 580 stockholders. As a result of the offer, 330 persons tendered a total of 267,209 shares to Empress, leaving 512,791 shares outstanding held by 252 stockholders as of December 10, 1974.[20] Of the shares that were not tendered, 52,791 shares were held by the public and 460,000 shares were held by Kolen and the four Kolen trusts.[21] As a result of the reduced number of Empress shares held publicly, the American Stock Exchange, on October 30, 1974, applied to the SEC to delist the stock and effective November 18, 1974 the SEC ordered the stock delisted.[22] Thereafter the stock has continued to be traded over-the-counter.[23]

Plaintiff Halle & Stieglitz, which owned 23,900 shares of Empress common stock immediately prior to the tender offer, tendered 13,400 of its shares to Empress, sold 10,000 of its shares in the arbitrage market resulting from the tender offer, and re-

11. Docket Item 26, pp. 28–37.

12. Docket Item 58, pp. 30–33, 39, 41.

13. *Id.* pp. 38–42.

14. *Id.* pp. 124–128.

15. *Id.* pp. 39–43.

16. *Id.* pp. 44–47; Docket Item 26, pp. 55–63.

17. Docket Item 58, pp. 44–45, 62–63, 127.

18. Docket Item 70, Ex. C.

19. Docket Item 27, Ex. A.

20. Docket Item 53, par. 19; Docket Item 70, Ex. A & B.

21. *Id.*

22. Docket Item 70, Ex. D & E.

23. Docket Item 26, p. 76.

tained the remaining 500 shares.[24] Plaintiff Gordon also tendered its 5000 shares under the tender offer.[25] Both corporate plaintiffs, at all times relevant, were under the common control of Milton A. Gordon, who owned 40 percent of the stock of Halle & Stieglitz and substantially all the stock of Gordon, and was the chief executive officer and director of both companies.[26]

Prior to the tender offer, on August 21, 1974, Empress disseminated a proxy statement to its stockholders soliciting proxies for the election of directors at the annual meeting scheduled to be held on September 13, 1974.[27] All five nominees for the directorships were incumbent directors [28] and all were reelected.

The plaintiffs purport to bring this action individually and on behalf of all Empress stockholders, other than defendants, who were shareholders on September 23, 1974, and who thereafter tendered their shares to Empress pursuant to the tender offer or who sold their shares on the arbitrage market created by the tender offer.[29]

The general thrust of the amended complaint is that the defendants as majority stockholders, by means of a coercive cash tender offer at a price grossly and intrinsically unfair, took advantage of the depressed market price of Empress common stock, in order to benefit themselves exclusively at the expense of, and to the detriment of, the minority public stockholders.

*Plaintiffs' Four Causes of Action*

(1) Plaintiffs' first cause of action is based upon the underlying allegation that the defendants, by means of the cash tender offer, "coerced" plaintiffs and other minority public shareholders to surrender their Empress stock, because, if they had not tendered their shares to Empress or sold

them in the arbitrage market created by the $4.50 per share tender price, they ran the serious risk that their investments would become worthless in view of the imminent delisting of the shares from the American Stock Exchange, the absence of any prospect for future dividends, and the absence of any disclosure protections afforded by Federal Securities Laws upon going private.[30] Plaintiffs further allege that the tender offer violated Section 10(b) of the Act and Rule 10(b)(5) thereunder in that it (a) "coerced" plaintiffs and other public stockholders to sell their shares for a price far less than their "fair or intrinsic value" at the time of the offer, (b) "coerced" the public shareholders out of the enterprise for no "legitimate and compelling business purpose" and (c) that this fraudulent scheme was accomplished in part by misleading and untrue statements or omissions of material facts in (1) the proxy statement of August 21, 1974, soliciting votes for the election of directors at the annual meeting and (2) in the tender offer statement of September 24, 1974, as more particularly described in the Second and Third Causes of Action.[31]

(2) Plaintiffs' second cause of action alleges that the proxy statement, dated August 21, 1974, which solicited shareholders' proxies for the September 13 annual meeting for the election of directors for the forthcoming year, violated Section 14(a) of the Act and Rules 14a–3 and 14a–9 thereunder in that it failed to disclose and deliberately concealed the material information that the Board of Directors "intended immediately following their reelection to cause Empress to make a tender offer which would eliminate from the enterprise the same public shareholders whose proxies

**24.** Docket Item 27, par. 2.

**25.** *Id.*

**26.** Docket Item 57, pp. 7–11; Docket Item 28, pars. 16–18.

**27.** Docket Item 27, Ex. B.

**28.** *Id.*, Ex. B, p. 2.

**29.** Docket Item 27, par. 3; the Court has not certified this action as a class action under Rule 23(c), F.R.Civ.P.

**30.** Docket Item 27, par. 18.

**31.** *Id.* par. 21.

were then being solicited."[32] Furthermore, the second cause of action alleges that this nondisclosure in the August 21 proxy statement not only violated Section 14(a) and above cited rules but had the domino effect of invalidating the proxies solicited and voiding the stockholders meeting of September 13 and the election of directors, which in turn invalidated the subsequent ratification of the tender offer by those directors elected at the annual meeting.[33]

(3) Plaintiffs' third cause of action alleges that the September 24, 1974, Offer to Purchase sent to Empress stockholders contained untrue statements of material fact and omitted to state material facts necessary in order to make statements not misleading in violation of Section 14(e) of the Act. In this regard two omissions are claimed, viz: (1) the statement failed to disclose that the tender offer was not "properly or legally authorized" for the reasons stated in the second cause of action [34] and (2) the statement failed to disclose that the tender offer price of $4.50 per share was "far less than its intrinsic value" and that the price had been arbitrarily set without benefit of an expert appraisal or impartial advice.[35] Finally, plaintiffs allege that the Offer to Purchase, which stated that the Board of Directors, in the exercise of its business judgment, believed that the purchase of shares was in the best interest of the company and that the purpose of the offer was to eliminate or substantially reduce the number of publicly owned shares, leaving Empress as a privately-owned company, was misleading because the Board never exercised its business judgment, the purpose was not as stated but was to enable the defendants to profit at the expense of the public shareholders, and the statement omitted to disclose that the tender offer had no valid business purpose.[36]

(4) Plaintiffs' fourth cause of action adds a pendent state law claim, that the tender offer as conceived and carried out by the defendants as majority shareholders breached their common law fiduciary duties to treat the minority public shareholders fairly.[37]

## Discussion

Plaintiffs now concede, and the Court agrees, that in view of the Supreme Court's recent holding in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the allegations in the first cause of action, which complain of the substantive unfairness and impropriety of Empress' "going private" tender offer (i. e., its alleged improper purpose, coercive nature and unfair price), no longer form a basis for federal court jurisdiction founded on Section 10(b) or Rule 10b–5 claims.[38] Accordingly, the claims of substantive unfairness, inequity and impropriety of the tender offer itself, apart from misleading statements or the omission of disclosures will be dismissed. *Santa Fe Industries, Inc. v. Green, supra.*

However, the plaintiffs now argue that the Empress tender offer because of material nondisclosures violated the *proxy rules* [§ 14(a) and Rules 14a–3 and 14a–9], the *tender offer rules* [§ 14(e)], and the *antifraud rules* of the Act [§ 10(b) and Rule 10b–5] since

". . . director approval was required and the directors who were to approve it [the tender offer] had first to be re-elected. Their re-election required that proxies be solicited from shareholders. That proxy solicitation was accomplished through a nondisclosure of a material fact [i. e., that the directors intended to cause Empress to make a 'going private' tender offer] which violated the federal proxy rules. . . . Under these circumstances, Defendants' nondisclosure of

32. *Id.* par. 24.

33. *Id.* par. 25.

34. *Id.* par. 28(a).

35. *Id.* par. 28(c).

36. *Id.* par. 28(b).

37. *Id.* pars. 30–33.

38. Docket Item 74, pp. 18–20.

a material fact was made 'in connection with' the tender offer and a purchase and sale of securities within the meaning of Section 14(e) and Rule 10b–5." [39]

 Thus plaintiffs' federal securities law challenge to Empress' tender offer wholly hinges upon the validity of plaintiffs' legal theory of deception in the reelection of the Empress directors at the September 13, 1974 annual meeting. The plaintiffs contend that the directors had, prior to August 21, 1974, informally approved in principle Kolen's plan to make a cash tender offer and yet when the proxy statement of August 24 was disseminated soliciting proxies for the election of directors at the September 13 annual meeting it failed to disclose that the director-nominees, after their election, intended to make a cash tender offer designed to eliminate from the enterprise the public shareholders whose proxies were solicited. The failure to disclose this material fact, plaintiffs urge, constituted a violation of Section 14(a) and Rules 14a–3 and 14a–9.

However, assuming that the Empress directors had informally agreed to make a cash tender offer prior to soliciting proxies on August 21 for the election of directors at the annual meeting,[40] they were under no duty to disclose that fact in the proxy materials under Section 14(a) or the rules thereunder. The facts are quite clear that the solicitation of proxies for the September 13 annual meeting was for the sole purpose of electing five directors to the board for the forthcoming year and for ratifying the board's selection of independent public auditors and was not for the purpose of voting upon a contemplated tender offer.[41] The law is well settled that in order to constitute a proxy violation under Section 14(a) and the rules thereunder, an omission or misrepresentation of a material fact must relate to the purpose for which the proxies

were solicited. *Levy v. Johnson*, CCH Fed. Sec.L.Rep. ¶ 95,899 (S.D.N.Y.1977); *Limmer v. General Telephone & Electronics Corp.*, CCH Fed.Sec.L.Rep. ¶ 96,111 (S.D.N.Y. 1977); *Markewich v. Adikes*, 422 F.Supp. 1144, 1147 (E.D.N.Y.1976); *In re Penn Central Securities Litigation*, 347 F.Supp. 1327, 1342 (E.D.Pa.1972), *aff'd*, 494 F.2d 528 (C.A.3, 1974). This is so because Section 14(a) was designed "to prevent management or others from obtaining authorization for corporate actions by means of deceptive or inadequate disclosures in proxy solicitation." *J. I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964). In this case, because the only corporate action sought to be authorized was the election of five directors and the ratification of the selection of independent auditors and no authorization was sought from the shareholders to approve a cash tender offer, there was no violation of Section 14(a) or the rules thereunder for failure to disclose a contemplated cash tender offer as a matter of law, since the injury complained of—"coercive tender offer"— was not directly traceable to the corporate action authorized by the electorate as a *result of* the proxy solicitation of August 21, 1974.

 Furthermore, causation is an essential element of a private action for damages under Sections 10(b), 14(a) and 14(e) of the Act. Thus, in order to establish a federal cause of action under any of these sections, a plaintiff must demonstrate a causal connection between the alleged wrongdoings of a defendant and the injuries suffered by the plaintiff. *Mills v. Electric Auto-Lite Company*, 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) (§ 14(a)); *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 238 (C.A.2, 1974) (§ 10(b)); *Altman v. Knight*, 431 F.Supp. 309, 314

---

**39.** *Id.* p. 29.

**40.** Defendants hotly dispute the fact that a final decision had been made by the directors to make a cash tender offer before August 21, 1974. This issue, however, need not be resolved by the Court because on defendants' motion for summary judgment it must consider

the evidence and pleadings in the light most favorable to the plaintiffs and assume that fact to be true. *Long v. Parker*, 390 F.2d 816, 821 (C.A.3, 1968).

**41.** Docket Item 27, Ex. B.

(S.D.N.Y.1977) (§ 14(e)). Therefore, assuming that Empress' proxy solicitation materials of August 21 failed to disclose the cash tender offer already agreed to in principle by the directors, it is clear, as a matter of law, that those acts of the defendants were not the cause of plaintiffs' injuries, the sale of their stock, because the essential element of causation is lacking.

In *Ketchum v. Green*, 415 F.Supp. 1367 (W.D.Pa.1976), the plaintiffs, two former officers and directors of Babb, Inc., were removed as officers by a majority vote of the defendant directors immediately following an annual shareholders' meeting wherein the plaintiffs and defendants had been reelected as directors. As a result of their removal as officers, plaintiffs became obligated to sell their Babb shares back to the corporation pursuant to a previously executed stock retirement agreement. The plaintiffs, in an attempt to bring their action under Section 10(b) and Rule 10b–5, made substantially the same argument as advanced here. They alleged that the defendants failed to disclose their intention to vote against the reelection of plaintiffs as officers immediately following defendants' reelection to the board. This nondisclosure allegedly amounted to fraud which directly infected the shareholder vote for directors and in turn tainted the subsequent board votes to remove plaintiffs from their corporate offices.

Responding to this argument, Judge Teitlebaum stated that even if he were to accept the dubious proposition that the alleged nondisclosures amounted to actionable fraud, he would be compelled to find an absence of causation in the case. The Court stated:

"Inasmuch as defendants constituted a majority of Babb's board of directors prior to the 1976 shareholders meeting and therefore could have caused Babb to terminate plaintiffs at any time prior thereto, the sale of plaintiffs' stock was not caused by any fraud that might have affected the results of the annual meeting." 415 F.Supp. at 1371.

The Court also noted that as a matter of policy it would be improper to exercise federal jurisdiction over the plaintiffs' claim where the relationship between the nondisclosure and the sale of securities was so attenuated. It stated:

"[I]n evaluating plaintiffs' apparent contention that 10b–5 reaches every securities transaction remotely related in any way to activities alleged to be fraudulent, it is important to consider that the broad exercise of federal jurisdiction, though sometimes clearly necessary or appropriate, amounts to nothing less than the broad assertion of federal power and, as such, never reverberates in a vacuum or impacts merely on an isolated lawsuit. Rather, each such exercise of jurisdiction works a diminution—both in an immediate, specific sense and as a matter of precedent—of the state's power to determine controversies arising under its laws, and, in my view, such undertakings should therefore be confined to cases that pose questions of true federal significance." 415 F.Supp. at 1373.

The Court's analysis and policy considerations in *Ketchum* bear directly upon this case. Since the relationship between the sales of plaintiffs' stock (made pursuant to the tender offer) and the alleged nondisclosure contained in the proxy solicitation for the election of directors is so attenuated, the exercise of federal jurisdiction in this case would be improper. If the plaintiffs' complaint can be construed to state a cause of action, it is one for breach of fiduciary duty under state law. *See: Singer v. Magnavox Company*, 380 A.2d 969 (Del.Sup.1977); *Lynch v. Vickers Energy Corporation* (Del.Sup.1977), slip opinion dated Oct. 18, 1977.

The Supreme Court in *Mills v. Electric Auto-Lite Company*, 396 U.S. at 385, 90 S.Ct. at 622, announced an objective test for determining causation, stating:

"[W]here there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he

proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."

Plaintiffs' federal securities laws causes of action do not meet this test. First, the particular defects alleged in this case in the proxy solicitation materials for the election of directors was not a link in the consummation of the alleged coercive tender offer because the offer was not authorized by a shareholder's vote at the September 13 annual meeting. Where an action is taken by directors by virtue of their office and not pursuant to an approval obtained by an alleged false proxy materials, the proxy solicitation is not an essential link in the accomplishment of the transaction, and the causation element is not satisfied. *Lewis v. Elam*, CCH Fed.Sec.L.Rep. ¶ 96,013 (S.D.N.Y.1977); *Epic Enterprises, Inc. v. Brothers*, 395 F.Supp. 773, 776 (N.D.Okl.1975).

Second, the proxy solicitation could not have been an essential link in the accomplishment of the tender offer because no shareholder vote was required to authorize the offer. *Altman v. Knight*, 431 F.Supp. 309, 314 (S.D.N.Y.1977). Any injury alleged under Sections 10(b), 14(a) or 14(e) of the Act in the amended complaint could only have been the result of the alleged "coercive" tender offer itself and not the result of any nondisclosures in the proxy materials. Nevertheless, plaintiffs attempt to avoid this result by alleging that a shareholder vote was required because, before the directors could approve the tender offer, they had first to be reelected. However, this type of "but for" argument of causation was specifically rejected in the recent case of *Levy v. Johnson*, CCH Fed. Sec.L.Rep. ¶ 95,899 (S.D.N.Y.1977):

"Plaintiff's argument, that 'but for' the proxy violations the defendant directors would not have been re-elected and could not have subsequently authorized the alleged improper payments, does not meet the transaction causation standard. If the court were to adopt the plaintiff's standard, any suppression of a director's impropriety in proxy materials for re-election, followed by a further impropriety after re-election, would state a claim under federal law. It was not intended that, by reason of a proxy violation, a purely state claim might be so transformed into a federal cause of action. Count II of plaintiff's complaint must be dismissed for failure to state a claim upon which relief can be granted." *Id.* at 91,-324.

Consequently, the plaintiffs' causes of action under Sections 10(b), 14(a) and 14(e), which are all premised upon the nondisclosure of a possible cash tender offer in the 1974 proxy solicitation, must fail as a matter of law for lack of the essential element of causation.

Finally, plaintiffs contend that Empress' tender offer was not legally authorized and is therefore invalid. Their argument appears as follows: since the proxy solicitation for the election of directors was deficient for failure to disclose the contemplated tender offer, the election of the directors was invalid, and because the election was invalid, the directors who authorized the tender offer had only *de facto* status and could not act for the corporation on purely internal affairs. This, however, is an incorrect legal conclusion. Under Delaware law a director who lawfully is in office before an election which later is found invalid continues in office until his successor is duly elected and qualified. *Vogtman v. Merchants' Mortgage & Credit Co.*, 20 364, 178 A. 99, 104 (1935). All the directors who approved the tender offer at issue in this case held office immediately prior to the 1974 annual meeting.[42] Thus, even if it is assumed that the election of directors is voidable, it is clear that the directors still would have had the authority to approve the tender offer. 8 Del.C. § 141(b).

The Court must conclude as a matter of law that the damages alleged by the plaintiffs are not the result of any violation of Section 10(b), 14(a) and 14(e) and that, if

---

42. Docket Item 27, Ex. B and Docket Item 70, Ex. C.

the plaintiffs have a cause of action, it is one for breach of fiduciary duties cognizable under state law. Consequently, the Court will grant summary judgment of dismissal of the first, second and third causes of action. In addition, the Court will dismiss without prejudice the plaintiffs' fourth cause of action, which is a pendent state law claim. Pendent jurisdiction is a doctrine of discretion, not of right; in light of the dismissal of all of the plaintiffs' federal claims, there is no reason for this Court to exercise jurisdiction over the state law claim. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

*Defendants' Two Counterclaims*

In a rather unusual manner of pleading the defendants have lumped a number of alleged causes of action based on separate transactions and occurrences into two "counterclaims". In general, the First Counterclaim alleges claims based upon (1) violations of Section 10(b) of the Act and Rules 10b–6 and 10b–7 thereunder, (2) the May 1972 Underwriting Agreement, and (3) Section 206 of the Investment Advisors Act of 1940 (the "Advisors Act") [15 U.S.C. § 80b–6]. The Second Counterclaim is also based upon an alleged violation of the Advisors Act. In dealing with these counterclaims, it will simplify matters to analyze the several "causes of action" based upon their underlying predicates.

Defendants' first charge (First Counterclaim pars. 39–40) [43] is that plaintiffs are answerable in damages for violation of Rules 10b–6 and 10b–7 under Section 10(b) of the Act. The gist of these claims is that (1) plaintiff Halle & Stieglitz failed to file "stabilization reports" in 1972 as required by Rule 10b–7, and (2) that plaintiff Halle & Stieglitz combined with plaintiff Gordon to violate Rule 10b–6, because Halle & Stieglitz caused Gordon to purchase Empress stock in 1972 during the period of "distribution".

These charges based on Section 10(b) are alleged to have arisen under the following fact situation: Halle & Stieglitz commenced the public offering of the Empress stock on May 3, 1972. While all the stock was preliminarily distributed, large portions of the stock were returned to Halle & Stieglitz. During the period May 3 to May 9, 1972, Halle & Stieglitz engaged in stabilizing transactions with respect to Empress stock but failed to file stabilization reports as required by Rule 10b–7. After May 9 until October 1972, when the stock was listed on the American Stock Exchange, Halle & Stieglitz purchased and sold Empress stock. During this time when Halle & Stieglitz was trading in Empress stock, it also was making recommendations to the public to invest in Empress stock. The defendants' failure to report these stabilizing transactions as required by Rule 10b–7 allegedly constituted a manipulative device prohibited by Section 10(b) of the Act.

Defendants allege that Rule 10b–6 prohibited Halle & Stieglitz, as an underwriter, from bidding for or purchasing Empress stock during its distribution. Defendants also allege that by repurchasing and selling stock during the distribution period Halle & Stieglitz violated Rule 10b–6.

■ However, assuming all those allegations to be true, defendants do not have standing to assert their violations because they were neither purchasers or sellers of securities within the meaning of Section 10(b) of the Act. The acts here complained of are not acts which infringe upon interests which Section 10(b) or Rules 10b–6 or 10b–7 were designed to protect.

In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Supreme Court reaffirmed the rule enunciated in *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (C.A.2), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), that no private civil remedy for money damages exists under Section 10(b) and Rule 10b–5 for other than defrauded purchasers and sellers of securities. In *Blue Chip* the Supreme Court held that persons who were neither actual pur-

---

**43.** Docket Item 53, pars. 39–40.

chasers or sellers were not within the class of persons entitled to sue for money damages under Rule 10b–5. Although *Blue Chip* dealt with a claim under Rule 10b–5, the Court's opinion makes it clear that the purchaser-seller requirement is one applicable generally to Section 10(b) itself. As the Court stated:

> "The longstanding acceptance by the courts, coupled with congress' failure to reject Birnbaum's reasonable interpretation of the wording of § 10(b), wording which is directed toward injury suffered 'in connection with the purchase or sale,' of securities (footnote omitted) argues significantly in favor of acceptance of the Birnbaum rule by this Court." 421 U.S. at 733, 95 S.Ct. at 1924. (citation omitted)

Since Rules 10b–6 and 10b–7 derive their statutory authority from Section 10(b), the *Blue Chip-Birnbaum* limitation is equally applicable to them. Defendants were not purchasers or sellers of Empress shares during the time of the acts complained of. Rather, they were *holders* of Empress stock, and they complain only of injury allegedly incurred by them as *holders*. Therefore, defendants have no standing to assert claims under Section 10(b) of the 1934 Act.

*See, e. g., Weitzen v. Kearns*, 271 F.Supp. 616, 623 (S.D.N.Y.1967), in which the Court held it to be

> ". . . apparent that Rule 10b–6 was designed to protect a *purchaser* of a security in a distribution from abnormal market pressures on the distribution price created by the issuer's or underwriter's own trading." (Emphasis added).

Defendants' absence of standing is clearly illuminated here. The defendants *held* their shares. They did not purchase them or sell them on the open market. Consequently, defendants' counterclaim based on a violation of Section 10(b) of the Act and Rules 10b–6 and 10b–7 will be dismissed.

■ With respect to the claim of violation of the May 18 Underwriting Agree-

ment, defendants allege in paragraph 44 of the First Counterclaim: [44]

> "Upon information and belief, Halle & Stieglitz breached its contractual agreement with Empress, as contained in the Underwriting Agreement dated May 3, 1972, to underwrite a 'public' offering of Empress Common Stock by failing to distribute approximately 29,000 shares of said stock to the public and by failing generally to effect a bona fide distribution of said stock."

The only statement in the Underwriting Agreement [45] which bears any remote relationship to this allegation is Paragraph 4, which provides that "the Underwriters will make a public offering". It is undisputed that the underwriters did make a public offering. However, the Underwriting Agreement did not provide that each and every share must end up, without fail, in the hands of private investors. The underwriters' commitment was to "offer", and to the extent their offer was not accepted, they suffered the financial penalty imposed by a declining market while the defendants benefited from the underwriters' honoring their commitment to take the underwritten stock at the underwritten price of $13.30 per share.

In short, the defendants' sole protectible interests in connection with the Underwriting Agreement were that the underwriters (1) purchase *from defendants* all 320,000 shares and (2) *offer* all shares to the public. Both acts were accomplished. All 320,000 shares were bought by the underwriters from defendants and all were *offered* to the public. The fact that external circumstances beyond their control prevented the underwriters from ultimately placing all offered shares in public hands does not as a matter of law constitute a breach of the Underwriting Agreement. Their claim on the undisputed facts fails to state a valid cause of action.

■ The third basis for the counterclaims are the allegations that Halle &

---

**44.** Docket Item 53, par. 44.

**45.** Docket Item 61, Ex. D, par. 4.

Stieglitz violated Section 206 of the Advisors Act. Paragraph 45 of the First Counterclaim alleges that Halle & Stieglitz "wilfully violated Section 206 of the Advisors Act": [46]

". . . in that, through its division, Equity Research Associates, it recommended in August, 1972, to its own customers and others that they purchase shares of Empress Common Stock without disclosing to such customers that Halle & Stieglitz had a substantial position in said stock which it acquired prior to and in contemplation of such recommendations; such recommendations were made for the purpose of artificially raising the market so that Halle & Stieglitz could dispose of its large position in Empress stock at higher prices; and, subsequent to the making of such recommendations, Halle & Stieglitz engaged in the sale of Empress Common Stock to the public."

It is clear that paragraph 45 does not state a claim against Halle & Stieglitz on behalf of the defendants but rather represents an effort to assert a claim on behalf of Halle & Stieglitz' customers, none of whom are parties to this action. Thus paragraph 45 as a matter of law asserts no valid cause of action against the plaintiffs.

Violation of the Advisors Act is also alleged in the Second Counterclaim, as follows: [47]

"49. Empress, the counterclaiming defendant, has since May, 1972, continually been receptive to bona fide opportunities to expand its business through acquisitions of or mergers with other companies.

50. Commencing on October 29, 1972, and continuing thereafter throughout 1973, Halle & Stieglitz, at the request of Martin Kolen, President of Empress, undertook to search for companies with whom Empress could enter into a merger or acquisition and to advise Empress with respect to acquisition opportunities, for which Halle & Stieglitz was to be paid a fee contingent upon the closing by Empress of such a merger or acquisition.

51. In its relationship with Empress, Halle & Stieglitz wilfully violated Section 206 of the Advisors Act, its advisory contract with Empress, and its common law fiduciary duty to Empress in that, through instrumentalities of interstate commerce, directly and indirectly, it did employ devices, schemes, and artifices to defraud Empress and did engage in practices and a course of business which operated as a fraud or deceit upon Empress by (a) falsely representing the value of securities whose purchase it recommended to Empress, to wit, the securities of Niagara Falls Wine Celler, Inc.; (b) failing to disclose interests held by it which were adverse to those of Empress in respect of such proposed transactions, to wit, the relationship between Halle & Stieglitz and Matthew Stuart & Co. in connection with the proposed acquisition of Gourmet Seafood Canning Company; and (c) failing diligently to perform the advisory services which it undertook to perform.

52. As a proximate result of the foregoing violations and breaches, officers of Empress were required to expend time and company funds for the purpose of exploring unsuitable acquisition opportunities brought to their attention by Halle & Stieglitz, resulting in damages to Empress in such amounts as the proof shall show."

■ With respect to this cause of action stated in the Second Counterclaim based on the Advisors Act, the facts are in dispute and may not be resolved on a motion for summary judgment. Thus, plaintiffs' motion for summary judgment on this issue will be denied.

Accordingly, an order will be entered granting defendants' motion for summary judgment dismissing the complaint and plaintiffs' motion for summary judgment dismissing the defendants' counterclaims will be granted except for the claim based

---

**46.** Docket Item 53, par. 45.

**47.** *Id.* pars. 49–52.

on Halle & Stieglitz' violation of the Advisors Act relating to Empress' acquisition program.