557 F.2d 1022
 Fed. Sec. L. Rep. P 96,107
Chandler G. KETCHUM and Harold S. Bigler, Appellants,
v.
Edward J. GREEN, Harry B. Hiltz, Jr., John C. McCutchen,
David G. Roof, William M. Waugh, Jr., Ronald B.
Livingston, William M. Steele and Babb, Inc.
 No. 76-2268.
 United States Court of Appeals,
Third Circuit.
 Argued May 3, 1977.
Decided June 30, 1977.
 
 Edmund K. Trent, Charles C. Cohen, Jonathan W. Delano, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellants.
 John J. McLean, Jr., Thomas M. Thompson, Lewis U. Davis, Jr., Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for appellees.
 Before ALDISERT and ADAMS, Circuit Judges, and MARKEY, Chief JudUnited States Court of Customs and Patent Appeals.*
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 The issue in this appeal is whether the district court erred when it dismissed the complaint in a dispute arising out of an intra-corporate contest for control of a close corporation. Specifically, we must ascertain whether the factual matrix here satisfies the "in connection with" clause present in both of § 10(b) of the Securities Exchange Act of 1934 and its administrative derivative, Rule 10b-5. Such clause requires for a cause of action that a misrepresentation be rendered in connection with a sale or purchase of a security.
 
 I.
 
 2
 Although the background for the litigation is somewhat complex, for purposes of this appeal we need only outline those facts pertinent to our decision.
 
 
 3
 Plaintiffs Ketchum and Bigler are the former Chairman of the Board and President, respectively, of Babb, Inc., a close corporation engaged in the insurance business. In addition to serving as directors of the company, both men were holders of substantial portions of the outstanding Babb stock, owning between them roughly forty-five per cent of such shares. The seven individual defendants constituted other directors and officers of Babb, with five of them holding approximately forty-eight per cent of the outstanding stock.
 
 
 4
 Under terms contained in a stock retirement agreement, dated November 18, 1968, all Babb shareholders are required to be employees of the corporation. Upon death, retirement or disability, a shareholder or his representative must surrender his stock, and the company is required to redeem such securities at a price determined by a formula relating to corporate income. In the event of a termination of employment for any other reason, only one-third of such formula price would be paid.[1]
 
 
 5
 Late in 1975, several of the defendants began discussions among themselves as to the possibility of removing Ketchum and Bigler as officers and employees of Babb. During the ensuing months, the same coterie of defendants continued to discuss the ouster of Ketchum and Bigler, enlisted the support of the remaining defendants, but concealed their scheme from the plaintiffs.[2]
 
 
 6
 In March of 1976, the entire board of directors, including the plaintiffs as well as the defendants, proceeded to appoint a committee to select nominees for the board and officer elections that were scheduled for the month of April. The committee, consisting of one of the plaintiffs, one of the defendants and another director of the company, decided to nominate the incumbent board members and officers, among them the two plaintiffs.
 
 
 7
 On April 23, 1976, the nominating committee submitted its slate of candidates for the board and officerships. The list was received, without any signs of dissension, at a directors' meeting that preceded the annual meeting of shareholders. By this juncture, the defendants had agreed among themselves to dislodge the plaintiffs as officers. Nevertheless, the defendants did not reveal their intention to oppose the reelection of the plaintiffs as officers, making no disclosure of their plan to depart from the usual practice of supporting candidates selected by the nominating committee.
 
 
 8
 During the April 23 shareholders' meeting, the defendants continued to conceal their plans regarding the election of officers. There is some indication that they did so out of necessity. Although the defendants constituted a majority of the board of directors, they held slightly less than fifty per cent of the outstanding Babb stock. Indeed, at the time of the shareholders' meeting, it was Ketchum and Bigler who possessed the controlling bloc of stock, given their own holdings together with proxies that they had obtained. Nevertheless, the plaintiffs, assuming that the defendants would support all of the candidates designated by the nominating committee, and having no reason to believe otherwise, joined with the defendants and other shareholders to reelect unanimously the incumbent directors. The result of the election was to return the defendants to their dominant position on the directorate.
 
 
 9
 Immediately following the meeting of the shareholders, the board of directors convened to elect company officers. The slate formulated by the nominating committee then was proposed. At that moment, the defendants made known, for the first time, their intention to expel Ketchum and Bigler as corporate officers. Rejecting the nominations of the plaintiffs, the defendants instead produced their own candidates for the positions of chairman of the board and president. The nominees of the defendants then were elected, thereby removing Ketchum and Bigler as officers.
 
 
 10
 Once the purge of the plaintiffs as officers was accomplished, the defendants, comprising a majority of the board, proceeded to terminate Bigler and Ketchum as Babb employees as well. Thereafter, the board adopted a resolution to purchase plaintiffs' shares, as authorized by the stock retirement plan, and then tendered payment for the purchase price. But Ketchum and Bigler have declined to surrender their stock certificates or to accept any payment for such shares.
 
 
 11
 Subsequent to these events, plaintiffs initiated the present lawsuit, seeking, inter alia, to enjoin their ouster as officers and shareholders of Babb and to secure damages. Basically, Bigler and Ketchum claim that the defendants, in violation of § 10(b) and Rule 10b-5, had fraudulently induced them to vote for their own demise. By masking and supposedly misrepresenting their intentions with respect to the officership election, the defendants, it is asserted, were able to retain their majority bloc on the board of directors, despite their minority position among the company stockholders. According to Ketchum and Bigler, such alleged improprieties in turn tainted the subsequent vote by the directors to depose and discharge the plaintiffs as officers, which then facilitated the removal of plaintiffs as employees, and which ultimately activated the stock retirement agreement compelling the sale and corporate repurchase of plaintiffs' stock.
 
 
 12
 After the entry of a stipulation of facts and a hearing concerning the plaintiffs' demand for injunctive relief, the district court dismissed the action for failure to state a claim under § 10(b) and Rule 10b-5. This appeal followed.II.
 
 
 13
 By now, § 10(b) of the 1934 Act[3] and Rule 10b-5,[4] promulgated thereunder, are together recognized as a cornerstone of the federal program of securities regulation. The statute has been applied to a plethora of activities involving securities, including insider trading based on undisclosed corporate information, misleading corporate publicity and banker-dealer conduct. This lawsuit, however, concerns the application of § 10(b) to another category of activity an internal struggle for control of a close corporation.
 
 
 14
 To set forth a claim under § 10(b), the complaint, before trial, and the record, following the completion of evidentiary processes, must enunciate the factual underpinnings for an exercise of authority by the federal courts. Although the provision articulates a number of prerequisites, the existence of three key elements is necessary if a cause of action is to obtain. First, there must be misrepresentation or fraud; second, a purchase or sale of a security must occur; and third, such misrepresentation or fraud must have been rendered "in connection with" the purchase or sale of a security.
 
 
 15
 Battle has been waged, of course, on many occasions over whether there has been compliance with the "fraud"[5] or "purchase/sale"[6] requirements of § 10(b). By contrast, the "connection" factor has received relatively scant consideration by the Supreme Court and other federal tribunals. Yet this litigation, in large measure, turns on the "connection" facet of § 10(b).
 
 
 16
 In its opinion, the district court decided that there was no basis for recovery under § 10(b). It did so on the ground that the claimed misrepresentation of the defendants did not occur "in connection with" a purchase or sale of securities. For purposes of such a disposition of the case, the trial judge assumed that the defendants had engaged in actionable fraud or deception, although his opinion voices grave "doubts" whether the conduct of the defendants constituted misrepresentations within the meaning of § 10(b).[7]
 
 
 17
 We now affirm the conclusion of the district judge that the relationship between the alleged misrepresentations and the sale/purchase with respect to plaintiffs' shares does not satisfy the "in connection with" requirement of the statute. Our position, however, diverges to some extent from that of the trial court, thereby making appropriate a full consideration of the "connection" question. In our analysis, we, too, shall assume that the defendants have engaged in a deceptive practice within the meaning of § 10(b).
 
 III.
 A.
 
 18
 It is not surprising that the "in connection with" clause of s10(b) has received limited attention from the federal courts. In the usual case, where the alleged deception concerns the terms of a securities transaction, there can be little question that the "connection" requirement has been fulfilled. It is in the less typical situation, such as the one before us, that the "in connection with" language may prove more troublesome.
 
 
 19
 The leading Supreme Court case dealing with the "connection" proviso of § 10(b), and the one upon which the plaintiffs primarily rely, is Superintendent of Life Insurance v. Bankers Life and Casualty Co.[8] In that case, a private action under Rule 10b-5, the trustee in bankruptcy of the Manhattan Life Insurance Company alleged that the defendants had conspired to misappropriate corporate assets through various securities transactions.
 
 
 20
 One of the defendants in Bankers Life had agreed to purchase all of Manhattan's stock for $5 million and, conspiring with several companions, drew a check for the purchase price on a New York bank. After replacing Manhattan's board of directors with new members, the defendants prevailed upon such board to sell for roughly $5 million U.S. Treasury bonds held by the company. This sum was then deposited by the defendants with the bank to cover the original check for the stock purchase. A series of intricate maneuvers followed in an attempt by the defendants to conceal the misappropriation and to deceive the board of directors as to the purpose of the bond transaction.
 
 
 21
 Dismissing the complaint in Bankers Life, the district court held that the transaction concerning the sale of the Treasury bonds was not connected with the fraud.[9] And the Second Circuit affirmed this dismissal.[10] Basically, these courts reasoned that the subterfuge involved merely the theft of bond proceeds after their receipt by the corporation and that the securities transaction itself remained unaffected by the fraud. But the Supreme Court reversed.
 
 
 22
 In his opinion, Justice Douglas ruled that the misappropriation of the bond proceeds was sufficiently connected with a securities transaction so as to bring the theft within the reach of § 10(b). In so holding, the Bankers Life Court declared that, in order to invoke the protection of § 10(b) and its derivative rule, a party must be defrauded "as a result of deceptive practices touching its sale (or purchase) of securities . . . ."[11] The Court also instructed that § 10(b) "must be read flexibly, not technically and restrictively."[12] Consequently, the complaint was reinstated, and the case remanded for trial.
 
 
 23
 Subsequent to Bankers Life, federal tribunals have tended to construe the "in connection with" element of 10(b) broadly.[13] Such courts have focused on the language in the Bankers Life opinion which suggests that the protection of the statute is available when there are "deceptive practices touching (the) sale (or purchase) of securities . . . ." Almost without exception, they have found compliance with the "connection" requirement even where fraudulent conduct is implicated only tangentially in a securities transaction. Yet these courts have not attempted to etch more finely the contours of the "in connection with" clause. And so Bankers Life remains as the precedent with which we must concern ourselves.
 
 
 24
 Even though the federal courts, by and large, have not felt compelled to engage in a searching exegesis respecting the "connection" facet of § 10(b), a few judges have recognized that the teachings of Bankers Life are hardly refined or capable of facile application. In Smallwood v. Pearl Brewing Company,[14] for example, Judge Wisdom declared: "We do not hazard an opinion as to the outer limits of (the Bankers Life ) test. It is important that the standard be fleshed out by a cautious case-by-case approach."[15] Such an approach is, in our view, the proper one for the current inquiry. This is especially so since we are called upon to delineate the perimeters of § 10(b) by determining whether the "connection" element has been satisfied in the litigation before us.
 
 
 25
 Ketchum and Bigler argue that the misrepresentations alleged by them do "touch" a securities transaction. They maintain that it was the failure of the defendants to disclose the plan to remove them from office which set in operation a chain of events that ultimately culminated in the forced sale of plaintiffs' shares. To so interpret Bankers Life is not entirely devoid of merit. Commentators have suggested that the "touch" language of the Bankers Life opinion could be interpreted to cover practically all disputes relating to intra-corporate management.[16]
 
 
 26
 We do not believe, however, that Bankers Life was intended to be so encompassing in its embrace. Justice Douglas emphasized, quite explicitly, that not all intra-corporate controversies fall within the scope of § 10(b). Indeed, his opinion states that "Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement."[17] If the present action essentially involves an instance of internal corporate mismanagement, then it would appear that the "touch" test of Bankers Life would not draw this lawsuit within the coverage of § 10(b).
 
 
 27
 Upon review of the stipulation of facts and the record of the proceedings before the district court, it becomes clear that the case at hand involves little more than allegations pertaining to an internal corporate conflict. Although the complaint seemingly stresses the importance of the relinquishment of plaintiffs' shares under the stock retirement plan, the factual stipulation and other segments of the record are largely silent on this point. For example, it is only in the concluding paragraphs of the stipulation that there is any mention of the forced sale of securities.[18] It thus is manifest that the essence of the plaintiffs' claim concerns their dismissal as officers of Babb, Inc.
 
 
 28
 Even the complaint itself belies the characterization of this case as more than an affray pertaining to internal corporate relationships. For the dominant thrust of the relief sought is directed against the termination of the plaintiffs as officers of the company. Not only do Ketchum and Bigler desire to enjoin the defendants from assuming their former positions, but they also seek to render nugatory the fateful shareholders' and directors' Elections of April 23. While it is true that the plaintiffs endeavor to enjoin the operation of the stock retirement program, this request does not modify the elemental nature of the controversy namely, a dispute arising from an internal contest for control of a corporation.
 
 
 29
 It would appear, then, that the present case does not constitute an instance in which misrepresentations were tendered "in connection with" a securities transaction. To the contrary, the purportedly deceptive practices occurred, if at all, in connection with the struggle for control of the corporation. Unlike Bankers Life, where the fraudulent conduct of the defendants undergirded the securities transaction, it cannot be said here that the misrepresentations bear a similar relationship to the forced sale of plaintiffs' stock. Consequently, the conflict before us would seem to fall within the reach of the "internal corporate mismanagement" exception in Bankers Life.
 
 B.
 
 30
 A second and obviously related basis for ruling that the current lawsuit does not fulfill the "connection" element of § 10(b) concerns the degree of proximity between the securities transaction and the claimed fraud. The Supreme Court's opinion in Bankers Life does not reveal how close a nexus must exist between a misrepresentation and a transaction.[19] Nonetheless, it is quite evident that there was a fairly tight linkage between these elements in the Bankers Life setting: the theft of the consideration flowing from the sale of the bonds was only one step removed from the bond transaction itself. Put another way, the bond transaction in Bankers Life was clearly undertaken for the purpose of making possible the practices alleged to be deceptive in particular, the misappropriation of the proceeds and their application so as to achieve a costless acquisition of the Manhattan stock.
 
 
 31
 By contrast, the degree of proximity seems to be more attenuated in the situation before us. Instead of being merely one step away from a securities deal, the supposed deception here is somewhat removed from the ultimate transaction. Indeed, there are a substantial number of intermediate steps between the fraud and the accomplishment of the forced sale of plaintiffs' shares: the shareholders' vote subsequent to the misrepresentation; the ensuing meeting of the company directorate during which the plaintiffs were removed as officers; and the adoption of the resolution terminating the plaintiffs' status as company employees. Only the last development triggered the operation of the stock retirement program, compelling Ketchum and Bigler to tender their shares to the corporation.
 
 
 32
 It thus is evident that the alleged misrepresentations on the part of the defendants were undertaken with the objective of inducing the expulsion of the plaintiffs as officers and employees not to foster the surrender of their stock. While it may be that the surrender of the shares will constitute a consequence of the defendants' overall scheme, we believe that such a consequence, at best, will be an indirect one. Accordingly, it would appear that the deceptive practices in which the defendants are alleged to have engaged and the ultimate sale of plaintiffs' stock are not tied sufficiently tightly so as to surmount the "connection" requirement of § 10(b), even as broadly formulated in Bankers Life.
 
 C.
 
 33
 This Court has addressed itself to the "connection" issue on only a few occasions. Perhaps the most significant statement on the matter is contained in Tully v. Mott Supermarkets, Inc.[20] There, the "in connection with" clause was viewed as "contemplat(ing) a causal connection between the alleged fraud and the purchase or sale of stock."[21] And in Tully, which involved allegations of fraud relating to the purchase of treasury stock by a class of corporate stockholders, the Court deemed the "requisite causal connection (to be) lacking."
 
 
 34
 In the present litigation, the trial court, though not citing Tully, similarly perceived the "connection" problem in terms of causation. It stated, for example, that "the 'in connection with' language of Rule 10b-5 requires a showing of causation between the alleged fraud and a plaintiff's sale (or purchase) of a security . . . ."[22] With this causation principle in mind, the district judge decided that the plaintiffs had failed to satisfy the "in connection with" requirement. The reasoning underlying this determination was that the operation of the stock retirement agreement not any deceptive practices on the part of the defendants caused the securities transaction involved in this action.
 
 
 35
 While it may be that Bankers Life suggests that the "connection" element of § 10(b) is not precisely the same as causation, since the bond sale only made possible the accomplishment of the fraud as opposed to having caused it, the two concepts are similar to one another. This is so because both the "connection" and "causation" principles speak to the degree of proximity required between a misrepresentation and a securities transaction.
 
 
 36
 If we deem "connection" and "causation" to be closely intertwined, and we may be obliged to do so in light of the recent statements of this Court in Tully, then it would appear that the plaintiffs simply have failed to bring their case within the ambit of § 10(b). The stock retirement program, to which plaintiffs and all other Babb employees are signatories, stands as the direct cause of the forced sale of the stock in the present context. Assuming that the supposed misrepresentations of the defendants did set into motion a chain of events which culminated in the securities transaction, we believe that the retirement agreement operates as an independent and intervening cause of such transaction a force that serves to disrupt the connection between the challenged conduct on the part of the defendants and the relinquishment of plaintiffs' shares.
 
 D.
 
 37
 Dismissal of the complaint for failure to comport with the "in connection with" clause of § 10(b) would appear to be in order for another reason, one that is implicit in the foregoing discussion. To rule otherwise, and to reinstate the present lawsuit, might tend to promote further incursions by federal courts into areas and activities now regulated by state corporation laws. While the coverage of § 10(b) may well have been intended by Congress to overlap somewhat with that of certain state provisions, it is questionable whether the scope of the statute should be extended to all phases of corporate operations and relationships whenever they entail the incidental involvement of securities. Realistically, there are a multitude of corporate decisions and endeavors which implicate securities in some fashion.
 
 
 38
 It is apparent, in our view, that § 10(b) was not designed to preempt, in effect, a large number of state corporation provisions. Yet the plaintiffs' expansive reading of the "in connection with" clause might open the door to such a development. We are, however, unwilling to accede to the position advanced by Ketchum and Bigler, especially in the absence of a precedential or legislative mandate to do so. As noted above, the Supreme Court intimated in Bankers Life that the statute should not be construed so as to foster the federalization of corporate law.[23] Not only is the legislative history of § 10(b) silent in this regard, but Congress repeatedly has rebuffed various proposals to preempt, in whole or part, the field of corporate regulation.[24] Carried to its natural terminus, the plaintiffs' construction of the "connection" proviso would serve to empty it of any substantive content.
 
 
 39
 Conceivably, the plaintiffs may have some compensable claim against the defendants under the Pennsylvania corporation laws. Whether they do is a matter that may not be dealt with by this Court, at least in the present case, since there is no basis for an exercise of federal diversity or other jurisdiction. Any relief that may be available to the plaintiffs is a matter to be decided in a state forum.
 
 E.
 
 40
 Because of the above considerations, we conclude that any fraudulent activity engaged in by the defendants cannot be said to have occurred "in connection with" the surrender of plaintiffs' stock to the company.
 
 IV.
 
 41
 The defendants in this appeal proffer a second basis for ruling that the plaintiffs have failed to state a claim, maintaining that the ouster plan did not encompass fraudulent practices actionable under § 10(b). In view of our decision with respect to the "in connection with" requirement of the statute, however, we need not address the question as to the existence of the requisite deception.[25]
 
 
 42
 The judgment of the district court, dismissing the complaint, will be affirmed.
 
 
 
 *
 Sitting by designation
 
 
 [1]
 At the time of this lawsuit, the prevailing repurchase price on death, retirement or disability was $7.90 per share. The corresponding price to be paid upon other forms of employment termination was $2.63. Plaintiffs claim, however, that their stock was worth $15.00 per share during the period covered by this action
 
 
 [2]
 In their briefs, the plaintiffs also allege that 7,500 shares were secretly and unlawfully issued to defendant David Roof by the other defendants in an attempt to gain a majority of the outstanding shares. Whether such issuance was unlawful is questionable, since the parties' stipulation of facts (see Appendix at 27a) reproduces the minutes of a meeting of the Babb board of directors, held March 8, 1977, which "reaffirmed that Mr. Roof (held) an option for 7,500 shares. . . ." Even including the stock attributable to defendant Roof, the defendants still evidently lacked a majority position among the shareholders. See footnote 1 of the opinion of the district court, reported at 415 F.Supp. 1367 (W.D.Pa.1976)
 
 
 [3]
 Section 10(b), 15 U.S.C. § 78j, provides in pertinent part:
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails . . .
 (b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."
 
 
 [4]
 Rule 10b-5, 17 C.F.R. § 240.10b-5, declares:
 "It shall be unlawful . . .
 (a) To employ any device, scheme, or artifice to defraud,
 (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security."
 For purposes of this opinion, references to § 10(b) should be viewed as encompassing Rule 10b-5, the administrative derivative of the statute.
 
 
 [5]
 See, e. g., Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 150-154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 848-53, 862-863 (2d Cir. 1968), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)
 
 
 [6]
 See, e. g., SEC v. National Securities, Inc., 393 U.S. 453, 464-468, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969); In re Penn Central Litigation, M.D.L. Docket No. 56, 494 F.2d 528, 532-539 (3d Cir. 1974); Hooper v. Mountain States Securities Corp., 282 F.2d 195, 200-03 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961)
 
 
 [7]
 415 F.Supp. at 1371 n. 6
 
 
 [8]
 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)
 
 
 [9]
 300 F.Supp. 1083 (S.D.N.Y.1969)
 
 
 [10]
 430 F.2d 355 (2d Cir. 1970)
 
 
 [11]
 404 U.S. at 12-13, 92 S.Ct. at 169
 
 
 [12]
 Id. at 12, 92 S.Ct. at 169
 
 
 [13]
 See, e. g. Jannes v. Microwave Communications, Inc., 461 F.2d 525, 529 (7th Cir. 1972); Drachman v. Harvey, 453 F.2d 722, 736-38 (2nd Cir. 1972) (en banc)
 
 
 [14]
 489 F.2d 579 (5th Cir. 1974)
 
 
 [15]
 Id. at 595
 
 
 [16]
 E. g., Note, The Controlling Influence Standard in Rule 10b-5 Corporate Mismanagement Suits, 86 Harv.L.Rev. 1007, 1013-14 (1973); The Supreme Court: 1971 Term, 86 Harv.L.Rev. 50, 263-264 (1972)
 
 
 [17]
 404 U.S. at 12, 92 S.Ct. at 169
 
 
 [18]
 The stipulation of facts devised by the parties is set forth in the Appendix at 14a-33a. For a copy of the complaint, see Appendix at 5a-11a
 
 
 [19]
 Speaking on the "proximity" facet of the "in connection with" clause, one commentator has posited: "Application of the (Bankers Life ) test on an ad hoc basis . . . (is) necessary to determine whether, in a given case, the relationship between the fraud and the securities transaction is too attenuated to support a 10b-5 claim." Jacobs, The Role of the Securities Exchange Act Rule 10b-5 in the Regulation of Corporate Management, 59 Cornell L.Rev. 27, 43 (1973)
 
 
 [20]
 540 F.2d 187 (3d Cir. 1976). Accord: Vincent v. Moench, 473 F.2d 430, 434 (10th Cir. 1973)
 
 
 [21]
 Id. at 194. (Emphasis added)
 
 
 [22]
 415 F.Supp. at 1371
 
 
 [23]
 See text accompanying note 17 supra
 
 
 [24]
 For a brief narration of several unsuccessful attempts to promulgate federal corporation laws, see 1 L. Loss, Securities Regulation 107-11 (2 ed. 1969) and Ruder, Pitfalls in the Development of Federal Law of Corporations by Implication Through Rule 10b-5, 59 N.W.U.L.Rev. 185, 206-207 (1964)
 
 
 [25]
 At oral argument, it also was questioned whether a sale or purchase of securities had occurred. Since a sale or purchase is a prerequisite for § 10(b) jurisdiction, the absence of such a transaction would, in itself, necessitate a dismissal of the complaint
 In the instant context, the plaintiffs have refused to surrender their shares to the corporation, repeatedly rejecting the payments that have been tendered to them. Because the redemption has not yet been consummated, it might be contended that plaintiffs have been premature in bringing their action. Nonetheless, it would appear that there already has been compliance with the "purchase/sale" requirement of § 10(b). This is so since 15 U.S.C. § 78c(a) (13) and (14) define "purchase" and "sale" to "include any contract to buy, purchase or otherwise acquire . . . (and) any contract to sell or otherwise dispose of." The stock retirement agreement here, despite the open-ended condition precedent that the plaintiffs be terminated as Babb employees, seemingly falls within the ambit of § 78c, thereby satisfying the "purchase/sale" clause of § 10(b).