L. M. BROWN, Plaintiff-Appellant,

v.

Milton W. IVIE, Jr., et al., Defendants-Appellees.

No. 80–7702.

United States Court of Appeals, Fifth Circuit.*

Unit B

Nov. 12, 1981.

---

**2.** Montgomery's appeal was dismissed because he escaped custody and became a fugitive.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Powell, Goldstein, Frazer & Murphy, Robert W. Patrick, Thomas S. Richey, William G. Leonard, Atlanta, Ga., for plaintiff-appellant.

Vaughan, Phears & Murphy, C. David Vaughan, Elizabeth Penn Payne, Atlanta, Ga., Downey, Cleveland & Moore, John H. Moore, Marietta, Ga., for defendants-appellees.

Before FAY, FRANK M. JOHNSON, Jr., and THOMAS A. CLARK, Circuit Judges.

FRANK M. JOHNSON, Jr., Circuit Judge:

Plaintiff L. M. Brown filed suit alleging that the defendants Ivie and Lightsey violated the federal Securities Act antifraud provisions by inducing him to enter into an agreement to sell his stock.[1] The district court dismissed the case, holding that plaintiff had failed to state a cause of action under the federal securities laws, and plaintiff appeals. We reverse.

Brown and two defendants were each an officer, a director and a one-third shareholder in a closely held corporation, United Power Distributors, Inc. Brown and Lightsey were also employed as salesmen for the corporation. In 1976 the three stockholders

---

**1.** Plaintiff alleged violations of Sections 10(b), 20, 27 and 29 of the Securities Exchange Act of 1934, 15 U.S.C.A. §§ 78j(b), 78t, 78aa and 78cc(b); Sections 12 and 15 of the Securities Act of 1933, 15 U.S.C.A. §§ 77l and 77o; Rule 10b-5, 17 C.F.R. § 240.10b--5, as well as a number of pendent state claims.

entered into a "buy-sell agreement" that required shareholders no longer employed with the corporation to sell their stock back to the corporation at book value. By setting the purchase price at book value, the 1976 agreement insured that a shareholder would receive less than fair market value for the stock.[2] The 1976 agreement also contained a provision requiring that a restrictive endorsement be placed on all stock certificates stating that any transfer of stock was subject to the terms of the 1976 agreement. Brown avers that the stock certificates were never properly indorsed, thereby rendering the 1976 agreement unenforceable.

In 1979 the defendants decided to oust Brown from the corporation and force him to sell his stock back to the corporation at less than fair value. Ivie and Lightsey recognized, however, that the 1976 agreement was unenforceable and could not be used to force Brown to sell his stock. As a result, the defendants drafted a new agreement that embodied terms substantially identical to those in the 1976 agreement.[3] The 1979 agreement required shareholders leaving the corporation to sell their shares back to the corporation at book value and to surrender possession of the stock certificates to a trustee. Brown was presented with the 1979 agreement and informed that the new agreement was necessary to effectuate a change in insurance companies and to increase the amount of insurance held by the corporation on each shareholder. The defendants omitted to tell Brown that they intended to oust him from the corporation and would be using the 1979 agreement to obtain his stock at less than fair value. Brown signed the agreement and seven days later defendants terminated his employment. Shortly thereafter Brown was also removed as officer and director. The defendants insisted that Brown sell his stock back to the corporation in accordance with the terms of the 1979 agreement. Brown refused and brought suit alleging that the defendants violated Section 10(b) of the Securities Exchange Act of 1934[4] and Rule 10b–5[5] by fraudulently inducing him to enter into the 1979 agreement. Ivie and Lightsey counterclaimed for specific performance of the agreement. The district court dismissed Brown's suit, conclud-

---

2. The 1976 agreement guaranteed that the book value price of the stock would be less than the fair market value by excluding from the calculations of book value allowances for good will and other similar intangibles, appreciation of inventory, and appreciation of machinery, fixtures and equipment.

3. The 1979 agreement contained some substantive differences from the 1976 agreement. The amount of insurance on each shareholder was increased and the provisions dealing with the disposition of stock at a shareholder's death were also altered. However, the particular terms relevant to this case—those giving the corporation the right to buy a shareholder's stock at book value in the event that the shareholder was no longer employed with the corporation—were substantially identical in both agreements.

4. Section 10(b) provides in pertinent part:
    It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
    *   *   *   *   *   *
    (b) To use or employ, in connection with the purchase or sale of any security regis-

tered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C.A. § 78j.

5. Rule 10b 5 provides:
    It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
    (a) To employ any device, scheme, or artifice to defraud,
    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made in the light of the circumstances under which they were made, not misleading, or
    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person *in connection with* the purchase or sale of any security (emphasis supplied).
17 C.F.R. § 240.10b–5.

ing that the alleged fraud had not been made "in connection with" the sale of a security as required by Rule 10b–5 and, alternatively, that the facts alleged by Brown involved an internal corporate dispute of the type not properly cognizable as a federal securities violation. 490 F.Supp. 409 (N.D.Ga.1980). The court also dismissed the defendants' counterclaims for lack of pendent jurisdiction over the subject matter.

■■■ A necessary element of a Rule 10b–5 offense is that the fraud or deceit be "in connection with" the sale of a security. *Superintendent of Insurance v. Banker's Life & Cas. Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). In *Alley v. Miramon,* 614 F.2d 1372 (5th Cir. 1980), the Court determined that "in connection with" is to be flexibly applied but requires that there be a nexus between the defendant's fraud and the securities "sale". However, the "plaintiff in a Rule 10b–5 case need not establish a direct or close relationship between the fraudulent transaction and the purchase or sale, but only that the transaction [involving the sale] 'touch' the transaction involving the defendant's fraud." *Id.* at 1378 n.11. *Accord, Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 595 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974); *McGrath v. Zenith Radio Corp.,* 651 F.2d 458, 467 (7th Cir. 1981). Whether fraudulent omissions or misrepresentations are too remote to be "in connection with" the sale of a security depends upon the individual facts of each case. *See McGrath v. Zenith Radio Corp., supra,* 651 F.2d at 467; *Goodman v. Epstein,* 582 F.2d 388, 411 (7th Cir. 1978), *cert. denied,* 440 U.S. 931, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). Applying the "touch" test enunciated in *Alley,* we conclude that the alleged fraud by the defendants was made "in connection with" the sale of a security.

The district court determined that "[a]ny alleged misrepresentation by the [defendants] as to why they wanted [Brown] to sign the [1979] agreement, is too remote to be 'in connection with' a securities transaction," 490 F.Supp. at 411, and relied primarily upon *Ketchum v. Green,* 557 F.2d 1022 (3d Cir. 1977), *cert. denied,* 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1978) to support the conclusion. *Ketchum* is, however, readily distinguishable from the present case. In *Ketchum* the plaintiffs alleged that they were ousted from the corporation as a result of defendants' misrepresentations and required by the terms of a "stock-retirement agreement" to sell their stock back to the corporation at less than fair value. The *Ketchum* court concluded that the fraud was too remote to be "in connection with" the sale of a security. The court stressed that the objective of defendants' alleged fraud was to expel plaintiffs from the corporation in order to gain control and that the resulting sale of securities was simply an "indirect" consequence of plaintiffs' expulsion. Significantly, the defendants in *Ketchum* did not as an integral part of their scheme induce the plaintiffs to enter into the stock-retirement agreement; the agreement had been executed over seven years prior to the alleged fraud. Thus, a nexus between the fraud and the securities transaction was clearly absent. *See also St. Louis U. Trust Co. v. Merrill Lynch, etc.,* 562 F.2d 1040 (8th Cir. 1977), *cert. denied,* 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978) (fraud too remote from securities transaction where stock was sold to corporation pursuant to a longstanding agreement and plaintiff had not been fraudulently induced to enter into the agreement).

The facts, as alleged, in the instant case demonstrate a more direct causal connection between the fraud and the sale of securities than was present in *Ketchum.* Unlike the situation in *Ketchum,* Ivie and Lightsey collectively controlled two-thirds of the corporate stock and had the power to terminate Brown's employment at any time. It is alleged, however, that Ivie and Lightsey did not have an enforceable agreement that required Brown to sell his stock back to the corporation upon termination of employment. As a result, the plaintiff contends that the defendants fraudulently induced him to sign the 1979 agreement, thereby guaranteeing that they would obtain his stock at book value. Thus, accepting the fraud as alleged, there is a direct connection between it and the execution of the 1979 agreement obligating Brown to

sell his stock for less than fair value. Since a contract for the sale or disposition of stock constitutes a sale of a security for purposes of the federal securities laws, 15 U.S.C.A. §§ 77b(3) and 78c(a)(14),[6] the defendants' fraud, as alleged, is "in connection with" the sale of a security.

■ Defendants nevertheless contend that the alleged fraud was not "in connection with" the sale of a security because even had the 1979 agreement been vitiated by fraud, Brown would have been required to sell his stock to the corporation under the terms of the 1976 agreement. Defendants' argument is predicated upon the validity of the 1976 agreement. However, for purposes of a motion to dismiss, we are constrained to accept as true the facts stated in Brown's complaint. *Dudley v. Southeastern Factor and Finance Corp.,* 446 F.2d 303 (5th Cir.), *cert. denied,* 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971). Since Brown has alleged, albeit in an obtuse manner, that the 1976 agreement is unenforceable, we accept the fact as true and accordingly must reject defendants' argument.[7] Defendants attempt to salvage their position by contending that the district court had the authority to find the 1976 agreement valid as a matter of law. Even were the validity of the 1976 agreement ascertainable as a matter of law, we note that the issue was not briefed below and that the district court made no specific finding concerning the agreement's enforceability.[8] Moreover, Brown has based his contention that the 1976 agreement is unenforceable on a number of grounds, including estoppel, unclean hands, fraud, illegality and the failure to place a restrictive endorsement on the stock certificates. It would seem unlikely that all of these grounds can be adju-

dicated by reference to the face of the pleadings, without any fact finding on the part of the district court.

■ The district court also found that the corporate struggle between Brown, a minority shareholder, and the two defendants, the majority shareholders, was beyond the purview of Rule 10b–5 under the rationale articulated by the Supreme Court in *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). In *Santa Fe,* the Supreme Court concluded that Rule 10b–5 did not encompass claims by a minority shareholder concerning a breach of fiduciary duty by the majority shareholders where there were no allegations of misrepresentation or nondisclosure. The Fifth Circuit has interpreted *Santa Fe* as precluding application of Rule 10b–5 only if the breach of fiduciary duty does not involve misrepresentations or nondisclosures. *Croy v. Campbell,* 624 F.2d 709, 716 n.7 (5th Cir. 1980); *Alley v. Miramon, supra,* 614 F.2d 1380 n.15. This interpretation of *Santa Fe* has been adopted by other circuits. *Panter v. Marshall Field & Co.,* 646 F.2d 271, 288 (7th Cir. 1981); *Healey v. Catalyst Recovery of Pennsylvania,* 616 F.2d 641, 646–47 (3d Cir. 1980); *Nash v. Farmers New World Life Insurance Co.,* 570 F.2d 558, 562 (6th Cir.), *cert. denied,* 439 U.S. 822, 99 S.Ct. 89, 58 L.Ed.2d 114 (1978); *Goldberg v. Meridor,* 567 F.2d 209, 218–19 (2d Cir. 1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978). Brown has averred the requisite nondisclosures and misrepresentations necessary to overcome the hurdles presented by *Santa Fe.* The complaint contains affirmative allegations that the defendants fraudulently misrepresented that the purpose of the 1979 agreement was to alter the insurance provisions

---

**6.** Section 2 of the 1933 Securities Act states that the "term 'sale' . . . shall include every contract of sale or disposition of a security or interest in a security," 15 U.S.C.A. § 77b(3). Section 3 of the Securities Exchange Act of 1934 states that the "term 'sale' . . . include[s] any contract to sell or otherwise dispose of [securities]." 15 U.S.C.A. § 78c(a)(14).

**7.** Plaintiff's complaint obliquely states that the 1976 agreement "was never consummated." Although the averment is not exactly a paragon of clarity, we are mindful that complaints are

to be liberally construed, *Hargrave v. McKinney,* 413 F.2d 320, 324 (5th Cir. 1969), and conclude that the averment sufficiently conveys the notion that the 1976 agreement is invalid and unenforceable.

**8.** The district court labeled Brown's contention that the 1976 agreement had not been consummated "a puzzling assertion." 490 F.Supp. at 410. However, the court never made any specific finding as to the validity of the agreement.

and provide increased compensation in the event of a shareholder's death or disability, and that the defendants fraudulently omitted to inform Brown that they sought the agreement in order to obtain his stock at less than fair value. Because of the presence of these allegations of fraud, Brown's claim is not beyond the scope of Rule 10b–5.

Our decision intimates no position as to the merits of plaintiff's case. We simply hold that the district court erred in concluding that plaintiff failed to state a claim under the federal securities laws.

REVERSED.