Sidney J. RUDOLPH, individually and on Behalf of all other persons similarly situated, and Joseph D. Decosimo, Trustee in Liquidation of the DeLorean Research Limited Partnership, a Michigan Limited Partnership, Plaintiffs-Appellants,

v.

ARTHUR ANDERSEN & CO., an Illinois partnership, Defendant-Appellee.

No. 85–5722.

United States Court of Appeals, Eleventh Circuit.

Sept. 29, 1986.

Murray Sams, Jr., Peter J. Yanowitch, Frank D. Newman, Sams & Ward, P.A., Miami, Fla., Sidney Davis, Davis, Markel & Edwards, New York City, for plaintiffs-appellants.

Martin B. Woods, Stearns, Weaver, Miller, Wissler, Alhadeff & Sitterson, Bruce W. Greer, Greer, Homer, Cope & Bonner, P.A., Miami, Fla., James J. Sabella, New York City, for defendant-appellee.

Before VANCE and ANDERSON, Circuit Judges, and PITTMAN *, Senior District Judge.

VANCE, Circuit Judge:

The district court dismissed plaintiffs' complaint and denied leave to amend on the ground that neither the complaint before the court nor the proposed amended complaint stated a federal claim. We find the proposed complaint sufficient to state a claim and thus reverse.

I.

This case stems from the travails of auto magnate John DeLorean. When DeLorean's ill-fated sports car production venture collapsed, investors in a limited partnership DeLorean set up ("DRLP") lost their money. DRLP's liquidating trustee, along with one investor, filed suit in the Southern District of Florida against defendant Arthur Andersen & Co. ("Andersen"), claiming that DeLorean[1] had intentionally defrauded the investors and that Andersen is liable for the loss because it either knew or should have known of the fraud.

Plaintiffs have had great difficulty stating a federal cause of action. Their original complaint stated only state law claims and no sufficient basis for diversity jurisdiction. Upon threat of dismissal, plaintiffs amended the complaint to allege violation by Andersen of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and corresponding SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, as well as liability on the part of Andersen for aiding and abetting securities violations by DeLorean. After Andersen moved to dismiss for failure to state a federal securities claim, plaintiffs moved for leave to amend and submitted their proposed amended complaint. The district court, however, granted Andersen's motion for dismissal. The court also denied leave to amend, concluding that the proposed complaint also failed to state a federal claim. Plaintiffs now contend that the district court erred in determining that the proposed amended complaint was insufficient.

II.

A decision whether to grant leave to amend is within the discretion of the district court, *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), but that discretion is severely circumscribed. Federal Rule of Civil Procedure 15(a) declares that leave to amend "shall be freely given when justice so requires." Because "this mandate is to be heeded," there must be a "justifying reason" for a court to deny leave. *Foman*, 371 U.S. at 182, 83 S.Ct. at 230; *see also Halliburton & Asso-*

* Honorable Virgil Pittman, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

1. The sports car venture involved numerous business entities created or controlled by DeLo-rean. Since the distinctions between them are irrelevant at this point we refer to all of them (other than the DRLP) and to DeLorean himself collectively as "DeLorean."

*ciates v. Henderson, Few & Co.,* 774 F.2d 441, 443 (11th Cir.1985) ("substantial reason" needed).

■ The district court here gave a reason for its denial of leave to amend: it concluded that allowing the amendment would be futile because the proposed amended complaint failed to state a claim. If correct, that conclusion would be sufficient to support a denial of leave. *Halliburton,* 774 F.2d at 444. Our role, therefore, is limited to determining whether the proposed complaint fails to state a claim under Rule 10b–5. If the complaint *does* state such a claim, the court's justification for denying leave to amend fails and the denial becomes improper under *Foman.*

### III.

Plaintiffs' proposed amended complaint can reasonably be read to allege the following:

1. On March 23, 1978, DeLorean issued a Private Placement Memorandum ("the placement memo") offering DRLP limited partnership investment units for sale. The placement memo represented that the funds raised by the partnership offering would be used for research and development related to the production of a new sports car. The research and development aspect was an important part of the offering, since the return to investors was linked in part to the success of the research, and since the offering purported to make available substantial research and development tax benefits.

2. At the time the memo was issued DeLorean actually intended to use the funds raised through the offering for research and development. The assumption at that point was that the manufacturing operation would be located in Puerto Rico.

3. Audit reports and other financial statements concerning DeLorean were included in the memo. These reports and statements were prepared by Andersen and were included in the memo with Andersen's permission. They related to the past financial condition of the DeLorean entities, specifically the years 1976 and 1977.

4. In late June or July [2] DeLorean found that he could gain substantial financial benefits by locating the manufacturing facility in Northern Ireland instead of Puerto Rico. The better terms offered by Northern Ireland made the research and development funds being raised through the DRLP unnecessary. Consequently, at some point prior to July 28, 1978, DeLorean devised a scheme of fraud under which he would drop the original purpose of the DRLP and instead divert the funds being raised to other uses. The DRLP investors were not told of this change in plans.

5. On or about September 22, 1978, the sale of DRLP investment units was completed and the funds raised were withdrawn or "taken down" by DeLorean, as was the original plan as set forth in the placement memo. However, DeLorean did not use these funds for research and development.

6. During the entire period from the issuance of the placement memo to the takedown of the DRLP funds by DeLorean, Andersen was performing substantial non-auditing services for the DeLorean entities.

7. Because of its business relationship with DeLorean, Andersen knew or recklessly failed to learn of DeLorean's intention to divert the partnership funds. However, since DeLorean's intent to divert was not formulated until sometime after the issuance of the placement memo, Andersen obviously did not know of the scheme until after its reports and statements were in the memo.

8. Andersen willfully or recklessly failed to disclose the alleged fraud.

### IV.

#### A.

SEC Rule 10b–5 provides that

2. The complaint alleges that DeLorean and Northern Ireland officials reached an agreement in principle on or about June 26, 1978, with a formal agreement being signed on or about July 28.

[i]t shall be unlawful for any person, directly or indirectly . . .

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

There can be no doubt that plaintiffs' complaint contains sufficient allegations to support a Rule 10b–5 claim against DeLorean. Plaintiffs allege that in the course of selling securities—the partnership investment units [3]—DeLorean continuously represented that the partnership funds would be used for research and development, while actually deciding at some point during the sale to use the funds for some other purpose. This is surely the type of "untrue statement of a material fact . . . in connection with" the sale of securities that Rule 10b–5 was intended to prohibit.

It is also clear that if read literally, Rule 10b–5 would reach the alleged conduct of Andersen. The rule prohibits "omit[ting] to state a material fact" necessary to make the statements made not misleading. Plaintiffs' complaint accuses Andersen of doing just that, and of thereby leading to plaintiffs' injury.

 Rule 10b–5, however, is not read literally. Instead, a defendant's omission to state a material fact is proscribed only when the defendant has a duty to disclose. Such a duty may exist "where the law imposes special obligations, as for accountants, brokers, or other experts, depending on the circumstances of the case." *Woodward v. Metro Bank*, 522 F.2d 84, 97 n. 28 (5th Cir.1975). In evaluating the circumstances

we consider the relationship between the plaintiff and defendant, the parties' relative access to the information to be disclosed, the benefit derived by the defendant from the purchase or sale, defendant's awareness of plaintiff's reliance on defendant in making its investment decision, and defendant's role in initiating the purchase or sale.

*First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir.1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). A duty to disclose may also be created by a defendant's previous decision to speak voluntarily. Where a defendant's failure to speak would render the defendant's *own* prior speech misleading or deceptive, a duty to disclose arises. *See id.*

We have not held these factors to be exclusive; there may be others which may properly be taken into account in a particular situation. For instance, the extent of the defendant's knowledge and the significance of the misstatement, fraud or omission might be relevant. A defendant who *intentionally* did not reveal what he *knew* to be fraud might more reasonably be expected to speak out than a defendant who merely failed to learn of a material but ambiguous omission. The extent of the defendant's participation in the fraud might also be important. *See, e.g., Strong v. France*, 474 F.2d 747, 752 (9th Cir.1973).

### B.

Although this court has not considered the issue, *but see Woodward*, 522 F.2d at 97 n. 28 (listing accountants as an example of groups with "special obligations" imposing duty to disclose), other courts have held that accountants "have a duty to take reasonable steps to correct misstatements they have discovered in previous financial statements on which they know the public is relying." *IIT, An International Investment Trust v. Cornfeld*, 619 F.2d 909, 927 (2d Cir.1980) (citing with approval *Fischer*

---

**3.** Plaintiffs' proposed complaint suggests that certain other securities transactions by DeLorean could serve as the basis for Rule 10b–5

liability, but they have not pressed this contention on appeal.

*v. Kletz,* 266 F.Supp. 180, 188 (S.D.N.Y. 1967)). This duty arises from the fact that investors are likely to rely on an accountant's work.

> Where it gives an opinion or certifies statements, an auditing firm publicly assumes a role that carries a special relationship of trust vis-a-vis the public. The auditor in such a case holds itself out as an independent professional source of assurance that the audited company's financial presentations are accurate and reliable.... The importance of the act of certifying is such that a continuing duty to disclose has been imposed where the auditor learns facts revealing that a certification believed correct when issued was actually unwarranted. *Fischer v. Kletz,* 266 F.Supp. 180 (S.D.N.Y.1967).

*Gold v. DCL Inc.,* 399 F.Supp. 1123, 1127 (S.D.N.Y.1973) (some citations omitted).

On the other hand, courts have refused to hold accountants liable for not disclosing ordinary business information discovered after the completion of a report, where the information did not indicate that the report was inaccurate as of the date it was issued. In one typical case coincidentally involving defendant Andersen, *Ingenito v. Bermec Corp.,* 441 F.Supp. 525 (S.D.N.Y.1977), Andersen had conducted an audit of the subject company and had issued a report. The plaintiffs claimed that after the report was issued more recent financial data on the subject company came to Andersen's attention which painted a gloomier picture of the company's prospects. They sought "to impose on Andersen a continuing duty to keep investors apprised of adverse developments long after the date of the certified report." *Id.* at 549. The court concluded that

> [t]here is no basis for such a claim. The mere possession of adverse financial information regarding a public company does not require an independent auditor to disclose it.... This remains true even if the auditor previously has certified figures for a prior period, so long as the certified statement is still accurate as of the date of its issuance.

*Id.; see also Hirsch v. duPont,* 553 F.2d 750, 761–62 (2d Cir.1977); *In re North American Acceptance Corp. Securities Cases,* 513 F.Supp. 608, 636 (N.D.Ga.1981).

Although informative, these principles do not resolve this case. Here there is no allegation that Andersen's statements and reports were misleading *as of the time they were issued.* However, the information Andersen allegedly possessed without disclosing was not comprised of mere facts and figures casting some possible doubt on the continued usefulness of its earlier conclusions. Rather, Andersen is alleged to have known that DeLorean was using its statements and reports to commit a significant fraud.

The rule that an accountant is under no duty to disclose ordinary business information, unless it shows a previous report to have been misleading or incorrect when issued, is a sensible one. It would be asking too much to expect accountants to make difficult and time-consuming judgment calls about the nature of routine facts and figures turned up after a report has been completed. The situation is quite different, however, where the issue is disclosure of actual knowledge of fraud. Standing idly by while knowing one's good name is being used to perpetrate a fraud is inherently misleading. An investor might reasonably assume that an accounting firm would not permit inclusion of an audit report it prepared in a placement memo for an offering the firm knew to be fraudulent, and that such a firm would let it be known if it discovered to be fraudulent an offering with which it was associated. It is not unreasonable to expect an accountant, who stands in a "special relationship of trust vis-a-vis the public," *Gold,* 399 F.Supp. at 1127, and whose "duty is to safeguard the public interest," *Touche, Niven, Bailey & Smart,* 37 S.E.C. 629, 670 (1957), to disclose fraud in this type of circumstance, where the accountant's information is obviously superior to that of the investor, the cost to the accountant of revealing the

information minimal,[4] and the cost to investors of the information remaining secret potentially enormous.[5]

### C.

■ Since the existence of a duty to disclose hinges on the "circumstances of the case," *Woodward*, 522 F.2d at 97 n. 28, we cannot say on the pleadings whether Andersen actually had a duty to disclose. At this point we do not even know whether there was anything to be disclosed. Our only task is to determine whether plaintiffs could, consistent with their allegations, prove facts under which we would hold that Andersen had such a duty. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). We conclude that they could.

The complaint clearly alleges fraud on the part of DeLorean, and plaintiffs may be able to prove that fraud at trial. The complaint also alleges that Andersen performed non-auditing business services for DeLorean. Plaintiffs possibly could prove at trial that through these services Andersen was involved in the fraud itself. It is also likely that the evidence will show that Andersen had spoken previously with respect to the DRLP offering, through its audit reports and statements included in the placement memo, and that Andersen knew investors would rely to some extent on those reports and statements.[6] Plaintiffs might also prove that Andersen failed to disclose DeLorean's fraud even though it had *actual knowledge* of that fraud,[7] and that Andersen's access to information concerning the fraud was far greater than plaintiffs'. Proof of these circumstances would be sufficient to establish that Andersen had a duty to disclose.

### D.

■ Plaintiffs' proposed complaint also states a valid claim against Andersen for aiding and abetting securities violations by DeLorean. Liability for aiding and abetting under Rule 10b–5 attaches

> if some other party has committed a securities law violation, if the accused party has general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation.

*Woods v. Barnett Bank*, 765 F.2d 1004, 1009 (11th Cir.1985) (quoting *Woodward*, 522 F.2d at 94–95). Where the act alleged to constitute aiding and abetting is mere silence—failure to disclose fraud—the requirement of "knowing" assistance does not require a conscious intent to aid the fraud if the aider and abettor was under a duty to disclose. *Id.* at 1010 (citing *Wood-*

---

**4.** The accountant need not reach all potential investors; he could simply inform the Securities and Exchange Commission.

**5.** We emphasize, however, that our holding that plaintiffs have stated a cause of action is based on our consideration of *all* the circumstances. We do not hold that the mere fact that Andersen is alleged to have known its reports were being used in a fraudulent scheme is by itself enough to establish a duty to disclose.

**6.** The plaintiffs argued that reliance was not neccessary. *Affiliated UTE Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) presented special circumstances where defendants had an affirmative duty to disclose and stood mute. Under those particular circumstances, the court stated, "positive proof of reliance is not a prerequisite to recovery." It is for the district court to decide under the facts as developed whether reliance is necessary.

**7.** Our holding is based on the fact that plaintiffs have alleged actual knowledge on the part of Andersen. Although plaintiffs allege in the alternative that Andersen recklessly failed to learn of the fraud, we need not consider this alternative ground of liability at this point. We note, however, that although "recklessness can, under certain circumstances, be sufficient to establish scienter for purposes of the cause of action under Rule 10b–5," *Huddleston v. Herman & MacLean*, 640 F.2d 534, 545 (5th Cir. Unit A 1981), *aff'd in part & rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), proof of mere recklessness on Andersen's part might not suffice to establish a duty to disclose under the circumstances of this case. Simple negligence, of course, would not be enough. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976); *Benson*, 559 F.2d at 1318–19.

*ward,* 522 F.2d at 96–97). Whether the assistance was "substantial" depends on the totality of the circumstances. *Id.* (citing *Woodward,* 522 F.2d at 97).

As we discussed above, plaintiffs could, consistent with their allegations, prove at trial that DeLorean committed securities violations, that Andersen knew about DeLorean's fraudulent scheme, that Andersen did not disclose the scheme, and that in doing so Andersen violated a duty to disclose. Proof of such facts, sufficient to establish primary liability on the part of Andersen, could also suffice to prove aiding and abetting under the test of *Woods* and *Woodward.*

### V.

 Plaintiffs advance one more theory in support of their proposed complaint. They suggest that because DeLorean was involved in a "unitary scheme of fraud"—a continuous scheme which began before the takedown and continued afterward—Andersen's conduct after the takedown may also be considered in determining whether Andersen committed a Rule 10b–5 violation. During the post-takedown period Andersen is alleged to have conducted various audits for DeLorean and to have otherwise assisted with the business.

We agree with plaintiffs that post-takedown conduct by Andersen may be relevant, but we find it insufficient in itself to support a Rule 10b–5 action. It is true that for Rule 10b–5 to be applicable the alleged conduct need only have been "in connection with the purchase or sale." For the "in connection with" requirement to be satisfied it is enough that the fraud "touch" the sale in some manner. *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12–13, 92 S.Ct. 165, 168–69, 30 L.Ed.2d 128 (1971). The requirement is satisfied, for example, if the purchase or sale of a security and the proscribed conduct are "part of the same fraudulent scheme." *Alley v. Miramon,* 614 F.2d 1372, 1378 n. 11 (5th Cir.1980). Thus, if a scheme to defraud is formulated before a sale or purchase, the fraud when

carried out is considered to be "in connection" with the security transaction even if the scheme does not culminate until after the transaction. *See, e.g., Brown v. Ivie,* 661 F.2d 62, 65–66 (5th Cir. Unit B 1981), *cert. denied,* 455 U.S. 990, 102 S.Ct. 1614, 71 L.Ed.2d 850 (1982); *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 594–95 (5th Cir.) (discussing *Bankers Life* ), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974).

The cases make clear, however, that a fraudulent scheme which takes place entirely *after* the securities transaction is complete is not "in connection with" that transaction. *See e.g., Ohashi v. Verit Industries,* 536 F.2d 849, 853 (9th Cir.), *cert. denied,* 429 U.S. 1004, 97 S.Ct. 538, 50 L.Ed.2d 616 (1976); *Shamrock Associates v. Moraga Corp.,* 557 F.Supp. 198, 204 (D.Del.1983); *see also Brown,* 661 F.2d at 65 (discussing *Ketchum v. Green,* 557 F.2d 1022 (3d Cir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977)). This is true even if the scheme could not have been carried out "but for" the transaction. *See, e.g., Somogyi v. Butler,* 518 F.Supp. 970, 987 (D.N.J.1981). This rule is sensible in light of the main purpose of the federal securities laws: "to provide adequate disclosure of material facts to investors so they can decide whether to purchase or sell the respective securities." *Shamrock,* 557 F.Supp. at 205 (discussing 10b–5); *see also SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 279, 11 L.Ed.2d 237 (1963) (discussing federal securities law generally). If there is no fraudulent scheme until after a transaction is complete, there was nothing to disclose at or before the transaction and hence no Rule 10b–5 violation.

Similarly, even if a fraudulent scheme antedates the securities transaction, a failure on the part of a third party to disclose the fraud cannot be "in connection with" the transaction if the party did not learn (or could not have been expected to learn) of the fraud until after the transaction had occurred. Such a failure to disclose may affect the *value* of the underlying securi-

ties by making it more difficult for the fraud to be detected and put to an end. It cannot, however, be said to have any connection to the securities *transaction,* which was over before the third party came under a duty to disclose.

With these principles in mind it is easy to see that allegations of post-sale conduct by DeLorean and Andersen are not by themselves sufficient to support plaintiffs' substantive Rule 10b–5 claim. Conduct occurring after the takedown may be relevant to any ultimate recovery by plaintiffs if they can prove that the conduct was part of a unitary scheme. For them to recover, however, what is essential is that plaintiffs be able to prove their allegations that *before* the DRLP sale was completed, DeLorean had formed a scheme of fraud and Andersen had learned of it or had recklessly failed to do so.

 On the other hand, even if plaintiffs cannot show that Andersen knew or should have known about the alleged scheme before the DRLP transactions were completed, they may still be able to prove Andersen liable for aiding and abetting. To be liable for aiding and abetting Andersen must have had "general awareness that his role was part of an overall activity that is improper," and must have "knowingly and substantially assisted the violation." *Woods,* 765 F.2d at 1009 (quoting *Woodward,* 522 F.2d at 94–95). Although it is hard to conceive how Andersen's post-sale conduct could substantially assist the sale itself (which is necessary for there to be a violation "in connection with" a sale), we can conceive of circumstances in which a party could substantially assist a cover-up, and thus aid and abet a prior sale. By analogy one can be guilty of aiding and abetting a typical criminal endeavor through conduct occurring only after the underlying crime has been completed.[8]

---

8. Of course, for Andersen to be liable for aiding and abetting there must have been a Rule 10b–5 violation for Andersen to aid and abet. Thus, to establish either substantive or accomplice liabil-

## VI.

Plaintiffs' proposed complaint is by no means a model of good drafting. It is composed of more than 100 pages of factual allegations and state law claims with the language of the securities laws merely tacked on at the end. The allegations it makes are just barely sufficient. Under the liberal federal rules of pleading, however, no more is required. We conclude that plaintiffs have succeeded in stating a federal claim.

The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

ity on the part of Andersen plaintiffs would have to prove that DeLorean had formulated his scheme of fraud before the takedown.